In re LYKES BROS. STEAMSHIP
CO., INC., Debtor.

Bankruptcy No. 95–10453–BKC–8P1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

July 17, 1997.

Harley E. Riedel, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL.

Jeffrey Steen, Sidley & Austin, Chicago, IL.

*AMENDED ORDER (A) CONFIRMING DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION, AS MODIFIED, PURSUANT TO 11 U.S.C. § 1129 AND (B) APPROVING TRANSFER OF CERTAIN OF DEBTOR'S ASSETS TO, AND ASSUMPTION OF CERTAIN OBLIGATIONS BY, LYKES LINES LIMITED, LLC*

ALEXANDER L. PASKAY, Chief Judge.

LYKES BROS. STEAMSHIP CO., INC., as debtor and as debtor in possession ("Debtor"), having filed with this Court its First Amended Plan of Reorganization dated as of March 7, 1997 (the "Plan," and as modified by (i) the Modifica-

tion to Debtor's First Amended Plan of Reorganization Pursuant to 11 U.S.C. § 1127(a) dated April 2, 1997 (the "Modification"), (ii) the Second Modification to Debtor's First Amended Plan of Reorganization Pursuant to 11 U.S.C. § 1127(a) dated April 11, 1997 (the "Second Modification"), and (iii) the Amended and Restated Third Modification to Debtor's First Amended Plan of Reorganization Pursuant to 11 U.S.C. § 1127(b) dated July 16, 1997 (the "Amended and Restated Third Modification"),[1] collectively, the "Modified Plan")[2], IT IS ADJUDGED, DETERMINED AND FOUND after hearing and due and sufficient notice to all Creditors and interested parties and sufficient cause appearing therefor, that:

## A. PURPOSE OF THIS AMENDED CONFIRMATION ORDER

As set forth in Paragraphs 27 and 28 of this Order (the "Confirmation Order"), the Original Plan was confirmed by order dated April 15, 1997 (defined hereinbelow as the April 15 Confirmation Order). The April 15 Confirmation Order was not the subject of any timely-filed appeal and is now final. The Amended and Restated Third Modification represents a narrow and limited modification of the Original Plan, and nothing herein suggests that any unchanged provisions of the April 15 Confirmation Order are being modified or ruled on anew. This Confirmation Order is intended, however, to incorporate in one single order all of the Confirmation rulings, whether part of the April 15 Confirmation Order or whether relating to the Amended and Restated Third Modification.

## B. JURISDICTION AND PROCEDURAL BACKGROUND

1. This Court has jurisdiction over the Debtor, the Debtor's Chapter 11 case, all of the Debtor's Properties, contracts and assets, wherever located, all Claims against and Equity Interests in the Debtor, and all Creditors of the Debtor pursuant to 28 U.S.C. § 1334. Based upon the granting of the "Motion to Compromise with Lykes Lines" (as defined below), this Court has jurisdiction over the assets owned by the Debtor's wholly-owned subsidiary, Lykes Lines, Inc. ("Lykes Lines"), which are to be conveyed by the Debtor to the "Purchaser" (as defined below) at the Closing, free and clear of all liens, claims and encumbrances, following the Debtor's acquisition of title to those assets by foreclosure or otherwise. Confirmation of the Modified Plan is a "core proceeding" pursuant to, without limitation, 28 U.S.C. §§ 157(b)(2)(A), (L) and (O), and this Court has jurisdiction to enter a final order with respect thereto.

2. All capitalized terms used in this Confirmation Order but not defined herein shall have the meaning ascribed to such terms in the Modified Plan.

3. The Debtor, a corporation organized under the laws of the State of Louisiana, filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code on October 11, 1995 (the "Petition Date"). The Debtor was authorized by order of this Court and Sections 1107 and 1108 of the Bankruptcy Code to continue the operation and management of its business as debtor in possession.

4. The Debtor is a major international liner shipping company and vessel operating common carrier with roots going back to 1900. The Debtor's vessels regularly

---

1. *As discussed further below, the Amended and Restated Third Modification was filed with this Court on July 16, 1997 and amends and re-states, and replaces and supersedes, in its entirety that certain Third Modification to Debtor's First Amended Plan of Reorganization Pursuant to 11 U.S.C. § 1127(a) dated July 1, 1997.*

2. *For purposes of this Confirmation Order, the Plan, as modified by the Modification and the Second Modification, shall be referred to as the "Original Plan."*

carry goods in three trade routes on scheduled itineraries between ports on five continents and between ports in many foreign countries. The carriage and delivery of cargo by the Debtor generates a stream of revenue which funds vessel-related expenses, payroll, ground transportation, and other operating expenses.

5. Since the 1920s, the Debtor has owned and chartered significant numbers of United States-flagged vessels. At present, all of the Debtor's North Atlantic service vessels and its three Pacesetter Class Vessels are United States documented and flagged vessels.[3] The Debtor is currently party to an Operating–Differential Subsidy contract (the "ODS Contract") with the Maritime Administration, United States Department of Transportation ("MarAd"), which terminates on December 31, 1997.[4] The Debtor is also currently party to two contracts (the "MSC Contracts") with the United States Navy Military Sealift Command ("MSC") for the carriage of priority or preference cargo for the United States military. In late 1996, the Debtor filed applications to enroll all of its eligible United States-flagged vessels in the Maritime Security Program promulgated pursuant to the Maritime Security Act of 1996, Public Law 104–239 ("MSP"), and entered into, subject to Court approval, contracts under the MSP (the "MSP Contracts") with MarAd for three of its four Pacific Class Vessels.[5]

6. In the first ten months following its Chapter 11 filing, the Debtor was largely engaged in efforts to stabilize its business operations, including negotiating long-term agreements for its continued use of some 30,000 containers and chassis, settling issues related to its fleet composition, determining the amount of maritime liens on its vessels, and otherwise maintaining its customer base and regularizing its business operations. During this time, this Court fixed April 5, 1996 as the bar date for the filing of Proofs of Claim. Notice of this bar date was mailed to all Creditors of the Debtor and published throughout the world in accordance with this Court's orders. At various times thereafter, this Court set supplemental bar dates for the filing of maritime lien claims on specific vessels, requiring further service and publication of notices of these bar dates throughout the world. Appropriate affidavits and certificates have been filed in the record regarding such service and publication.

7. Beginning in the Summer of 1996, the Debtor focused its efforts on locating an investor or strategic partner in order to fund a plan of reorganization. On December 27, 1996, following extensive discussions, the Debtor and Lykes Lines entered into a letter of intent with Canadian Pacific Limited (the "CP Letter"). The CP Letter generally described the terms of a transaction pursuant to which the Debtor and Lykes Lines proposed to sell, and Canadian Pacific Limited (or one of its designated affiliates) agreed to purchase, certain assets of the Debtor and Lykes Lines for a purchase price of $30 million in cash plus the assumption of certain liabili-

3. *The Pacesetter Class Vessels are presently laid up in Orange, Texas and, pursuant to the APL Letter Agreement, will be redelivered to American President Lines, Ltd. ("APL") concurrently with the Closing under the Asset Purchase Agreement.*

4. *Pursuant to that certain Order Granting Debtor's Motion on Matters Related to the Maritime Administration dated July 10, 1997 [Docket Entry No. 3066] (the "MarAd Order"), on the Closing Date, the Debtor and MarAd will execute an addendum to the ODS Contract which will terminate the final subsidized voyages of the Pacific Class Vessels as of midnight*

*on the Effective Date. This addendum and the resulting termination were necessitated by the June 20 Decision (as defined below) and are without prejudice to rights of the Debtor and third parties as set forth in the MarAd Order.*

5. *Pursuant to the MarAd Order, this Court ruled (for the reasons stated therein) that the MSP Contracts were not approved, which ruling was without prejudice to any rights of the Debtor, the Reorganized Debtor, the Purchaser, Canadian Pacific Limited or MarAd with respect to the MSP Contracts.*

ties. The overall purposes of the transaction proposed in the CP Letter included: (a) the continuation of the United States flag operations of the Debtor, (b) the maintenance of the international liner services currently provided by the Debtor on a financially sustainable basis, (c) the preservation of the Debtor's 1,000 jobs, and (d) the distribution to the Debtor's Creditors of the proceeds from the cash purchase price. It was contemplated in the CP Letter that the United States-flagged vessels owned or operated by the Debtor would continue to be owned or operated following the Effective Date by the Reorganized Debtor, which would maintain its "Section 2" citizenship, and service the same trade routes as at present. It was further contemplated in the CP Letter that these vessels would maintain their United States flag registry consistent with all applicable contracts and laws, at least for as long as such vessels were able to participate in the ODS Contract and the MSP. It was also contemplated in the CP Letter that the equity interests in the Reorganized Debtor would be owned by Citizens of the United States with strong United States financial interests which would be independent from the Purchaser and which would ensure compliance with the Reorganized Debtor's obligations to MarAd under the ODS Contract and the MSP.

8. On January 9, 1997, this Court entered an order authorizing the Debtor's execution of the CP Letter and approving certain bid protections and other provisions contained in the CP Letter, establishing procedures for the consideration of competing bids for the sale of certain assets of the Debtor (the "Bidding Procedures"), and approving the method and form of notice of the Bidding Procedures. Pursuant to that order, this Court also set a deadline of February 14, 1997 for the filing of competing bids for certain of the Debtor's assets. Notice of the Bidding Procedures was published in *The Journal of Commerce* and *Lloyd's List* and was mailed to the parties listed on the master mailing matrix for this case and to any prospective purchaser that had previously expressed a written interest in acquiring the Debtor's assets. Appropriate affidavits and certificates have been filed in the record regarding such publication and service.

9. On January 23, 1997, this Court entered an order establishing procedures for the assumption and/or assignment by the Debtor to Canadian Pacific Limited (or one of its designated affiliates) of certain contracts and leases of the Debtor and Lykes Lines. Pursuant to that order, this Court also set a deadline of February 14, 1997 for the filing of any defaults, claims or Cure Claims under any such contracts and leases and for the filing of any objections to such assumption and/or assignment. Notice of these procedures and the February 14, 1997 bar date was mailed to all lessors or other parties to such contracts and leases. Appropriate affidavits and certificates have been filed in the record regarding such service.

10. On January 24, 1997, following extensive negotiations, the Debtor and Lykes Lines entered into an Asset Purchase Agreement (as amended and restated or as amended from time to time, the "Asset Purchase Agreement") with Lykes Lines Limited, a Bermuda corporation formerly known as Grouse (Bermuda) Limited ("Newco"). The parties to the Asset Purchase Agreement have agreed that, on the Closing Date, Lykes Lines Limited, LLC, a Delaware limited liability company and an indirect subsidiary of Canadian Pacific Limited (the "Purchaser"), will assume all of Newco's rights and obligations under the Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, the Debtor agreed to sell (subject to the approval of this Court), and Newco agreed to purchase, the "Acquired Assets" (as defined in Section 2.01 of the Asset Purchase Agreement) free and clear of any and all liens, claims and encumbrances (except for any Permitted Encumbrances) for a pur-

chase price of $30 million in cash plus the assumption of certain liabilities. Pursuant to Amendment No. 1 to Asset Purchase Agreement dated as of March 7, 1997 by and among the Debtor, Lykes Lines and Newco, the cash purchase price was increased to $34 million. The Asset Purchase Agreement replaced and superseded the CP Letter in its entirety, with the express exception of Paragraphs 9(a), (b), (c), (d), and (e) of the CP Letter. Executed copies of the CP Letter, the Asset Purchase Agreement, and Amendment No. 1 to Asset Purchase Agreement have been filed in the record and have been (and are) available for inspection by all Creditors and parties in interest.

11. On February 7, 1997, the Debtor filed with this Court (a) its Summary of Disclosure Statement for General Unsecured Creditors dated February 7, 1997 and its Summary of Disclosure Statement for Holders of Tort Claims dated February 7, 1997 (collectively, the "Summary Disclosure Statements"), (b) its Summary of Plan of Reorganization of Lykes Bros. Steamship Co., Inc. under Chapter 11 of the United States Bankruptcy Code (for Distribution to Holders of General Unsecured and Tort Claims) dated February 7, 1997 (the "Summary Plan"), and (c) a motion requesting that the Court approve the form of the Summary Disclosure Statements and the distribution of the Summary Disclosure Statements and the Summary Plan to certain Classes of Creditors (the "Summaries Motion").

12. On February 13, 1997, the Debtor filed with this Court its Plan of Reorganization and its Disclosure Statement, each dated as of February 10, 1997, and mailed copies of such documents to certain parties as directed by the Court and to parties filing a written request for copies of same.

13. On February 24, 1997, this Court entered an order approving the Debtor's execution of the Asset Purchase Agreement and determining that the offer of Newco as evidenced by the Asset Purchase Agreement constituted the highest and best offer for the Acquired Assets. No competing bid for the purchase of the Debtor's assets was filed with the Court, either pursuant to the Bidding Procedures or otherwise, by the February 14, 1997 deadline; nor has any such bid subsequently materialized. The offer evidenced by the Asset Purchase Agreement forms the basis and foundation for the Modified Plan.

14. On February 26, 1997, this Court entered the Debtor in Possession Financing Order approving the terms and conditions of the Debtor in Possession Financing in the amount of $2 million made by Canadian Pacific Limited (or its designee) to the Debtor, including the grant of a security interest to Canadian Pacific Limited (or its designee) as to certain assets of the Debtor. Pursuant to the Asset Purchase Agreement and the Debtor in Possession Financing Order, the Purchaser is permitted to deduct the amount of $2 million from the Purchase Price Proceeds to be paid at the Closing in accordance with the terms of the Asset Purchase Agreement and the Debtor in Possession Financing Order.

15. Also, on February 26, 1997, Bernard J. Morse, Esq. was appointed the Legal Representative for the "Future Claimants" pursuant to the Order Granting Debtor's Motion to Designate and Define Class of Future Claimants and to Appoint Legal Representative for Future Claimants (the "Appointment Order"). The Appointment Order decreed that the class of "Future Claimants" is defined and identified to be the following:

"All persons, known or unknown, who, after the effective date of Lykes' Chapter 11 plan of reorganization, may assert any claim, either directly or derivatively, for personal injury or wrongful death, including claims arising from alleged exposure to asbestos, against Lykes or its successors or assigns, which claim is based in whole or in part upon, arises from, relates to, or is in any way connected with (i) such person's pre-confir-

mation relationship with Lykes, including, without limitation, employment, contact, exposure, impact, or privity and (ii) any injury that either had not manifested itself prior to the effective date, was unknown to such person prior to the effective date, or as to which such person otherwise was deprived of representation and an opportunity to participate in this Chapter 11 case."

The Debtor's Motion to Designate and Define Class of Future Claimants and to Appoint Legal Representative for Future Claimants dated February 25, 1997 indicated that the "individuals most likely to fall within this class are seamen and other employees and independent contractors (and their family members and dependents) who allegedly have been exposed to asbestos fibers on Lykes' vessels but as to whom no manifestation of injury has yet occurred or who otherwise have not participated in this case." The Appointment Order further decreed that the Legal Representative is authorized to represent the interests of the Future Claimants in this case and in the reorganization process, and set forth the scope of work to be done by stating the Legal Representative:

"... is vested with full authority to take all actions necessary to represent the Future Claimants, including without limitation the **filing of claims, ballots,** and other appropriate papers, the **determination of the acceptance or rejection of any plan of reorganization on behalf of the class of Future Claimants,** the consideration of and, if appropriate, objection to any such plan, and participation in the confirmation process." (Emphasis added)

16. On March 7, 1997, this Court entered an order approving the assumption and/or assignment of the Selected Contracts, the Postpetition Contracts and the Prepetition Assumed Contracts to Canadian Pacific Limited (or one its designated affiliates), free and clear of any and all liens, claims and encumbrances, and affirming the February 14, 1997 bar date as to the filing of any defaults, claims and Cure Claims under, or any objection to the assumption and/or assignment of, the Selected Contracts, the Postpetition Contracts, the Prepetition Assumed Contracts and the Lykes Lines Contracts. Pursuant to that order, the Debtor and Newco were authorized to defer their decision on the assumption and/or assignment of certain contracts and leases and their objection to timely filed Cure Claims. On March 21, 1997, the Debtor and Newco timely filed their (1) Notice of Acceptance, Rejection or Proposed Modification of Certain Contracts and (2) Objection to Certain Cure Claims (the "Notice and Objection"). In the Notice and Objection, the Debtor and Newco timely objected to certain Cure Claims and notified certain parties to contracts and leases of the Debtor's determination of whether to assume and/or assign or reject such contracts or leases, all pursuant to the terms of 11 U.S.C. § 365. In addition, the Debtor and Newco timely filed, on March 27, 1997, their Notice of Conditional Acceptance of Contracts with APL and Safbank and Response to Safbank's Asserted Cure Claims and, on March 28, 1997, their Notice with Respect to Contract with FABC and Response to FABC's Asserted Cure Claims. As a result of these procedures and this Court's prior orders, the Court expressly finds that there are no defaults, claims, or Cure Claims under any of the Acquired Contracts (including the Selected Contracts and the Lykes Lines Contracts), with the sole exception of the FABC Cure Claim which shall be addressed as set forth in the FABC Charters Order. The final lists of Acquired Contracts are attached to the Amended and Restated Third Modification as *Exhibits E, G, H* and *K*.

17. On March 3, 1997, the Debtor filed a Motion for Confirmation of Plan of Reorganization Pursuant to § 1129(b) Notwithstanding Affirmative Vote of Various Classes (the "Motion for Cramdown").

18. This Court held a hearing on March 3, 1997 at 3:00 p.m. to consider

approval of the Disclosure Statement and the written objections thereto, the Summary Disclosure Statements, and the Summaries Motion. On March 5, 1997, this Court entered its Order (A) Approving Debtor's Disclosure Statement, (B) Fixing Time for Filling Objections to Debtor's Plan of Reorganization, (C) Fixing Time for Filing Acceptances or Rejections of Debtor's Plan of Reorganization, and (D) Approving Form of Notice Thereof (the "Disclosure Statement Order"). The Disclosure Statement Order approved the Debtor's Disclosure Statement as meeting the "adequate information" standards required by Section 1125 of the Bankruptcy Code, subject to the Debtor incorporating additional information in the Disclosure Statement.

19. The appropriate information was included by the Debtor in the Disclosure Statement and in the Summary Disclosure Statements immediately prior to and after the March 3, 1997 hearing. Subsequent to the entry of the Disclosure Statement Order, on March 7, 1997, the Debtor filed with this Court (a) its Amended Summary of Disclosure Statement for General Unsecured Creditors dated March 7, 1997 and its Amended Summary of Disclosure Statement for Holders of Tort Claims dated March 7, 1997 (collectively, the "Amended Summary Disclosure Statements"), and (b) its Amended Summary of First Amended Plan of Reorganization of Lykes Bros. Steamship Co., Inc. under Chapter 11 of the United States Bankruptcy Code (for Distribution to Holders of General Unsecured and Tort Claims) dated March 7, 1997 (the "Amended Summary Plan"). In addition to the foregoing, the Debtor filed its Amended and Restated Disclosure Statement (the "Amended and Restated Disclosure Statement") and the Plan, each dated as of March 7, 1997, with this Court on March 10, 1997 and March 12, 1997, respectively.

20. On March 5, 1997, this Court entered an order granting the Summaries Motion, pursuant to which the Court (a) approved the Amended Summary Disclosure Statements as meeting the "adequate information" standards required by Section 1125 of the Bankruptcy Code and approved the Amended Summary Plan, and (b) authorized the Debtor to mail the Amended Summary Disclosure Statements and the Amended Summary Plan to the Holders of Class 16 Unsecured Claims and Class 17 Tort Claims in lieu of the Amended and Restated Disclosure Statement and the Plan. Commencing on March 7, 1997, copies of the Amended Summary Disclosure Statements, the Amended Summary Plan, the "Confirmation Notice" (as defined below) and the Ballot were mailed by the Debtor to all Holders of Class 16 Unsecured Claims and Class 17 Tort Claims (including individual alleged asbestos claimants represented by The Maritime Asbestosis Legal Clinic (the "MALC Asbestos Claimants")) and all other Creditors and parties in interest. Appropriate affidavits and certificates have been filed in the record regarding such service.

21. Commencing on March 12, 1997, pursuant to the Disclosure Statement Order, copies of the Amended and Restated Disclosure Statement, the Plan, the Confirmation Notice and the Ballot were mailed by the Debtor to all Holders of Claims in Classes 1–15 and to all Holders of Class 18 Equity Interests and to certain other Creditors and parties in interest. Appropriate affidavits and certificates have been filed in the record regarding such service.

22. The Disclosure Statement Order also approved a form of Notice concerning matters related to Confirmation, including the deadlines for voting on and objecting to the Plan (the "Confirmation Notice"), which was mailed to all Creditors and parties in interest and published in the same newspapers in which the Debtor had published notice of the various bar date orders relating to maritime lien claims on vessels and such other publications as the Debtor deemed appropriate. The Court hereby finds that the Debtor timely and properly

mailed and published the Confirmation Notice in accordance with the terms of the Disclosure Statement Order. Appropriate affidavits and certificates have been filed in the record regarding such service and publication.

23. In the Disclosure Statement Order, the Court fixed (a) March 28, 1997 as the last date for the filing of Ballots accepting or rejecting the Plan, (b) March 24, 1997 as the last date for the filing of written objections to Confirmation of the Plan, (c) April 1, 1997 as the hearing date for the Motion for Cramdown and objections to the Plan, and (d) April 2, 1997 as the date for the Confirmation Hearing. Pursuant to Rule 2.20 of the Local Rules, the scheduling of the Confirmation Hearing also served to establish a final bar date of the fifteenth (15th) day prior to the April 2, 1997 Confirmation Hearing (or March 18, 1997) for the filing of Administrative Claims (other than Administrative Claims of Professionals).

24. On March 26, 1997, this Court entered an order approving the Shipyards Agreement, subject to the filing of objections thereto on or before April 1, 1997. No such objections were timely filed with this Court.

25. On April 1, 1997, this Court entered an Order Granting Motion to Invoke Application of Rule 7023 to Rule 9014, for Leave to file Class Proof of Claim and to Determine Voting Procedures for the Legal Representative, which order invoked application of Rule 7023 of the Bankruptcy Rules to Bankruptcy Rule 9014, designated the Legal Representative as the representative for the class of Future Claimants, and granted the Legal Representative leave to file a class Proof of Claim on behalf of some 31,204 potential Future Claimants, file a Ballot on their behalf, and participate in the Confirmation proceedings consistent therewith.

## C. THE APRIL 1, 1997 AND APRIL 2, 1997 CONFIRMATION HEARINGS

26. The Court held a hearing on April 1, 1997 at 1:30 p.m. (the "April 1 Hearing") to consider the Motion for Cramdown and objections that were filed to the Plan, and continued the April 1 Hearing as to certain matters to April 2, 1997 at 9:00 a.m. The Court held a hearing on April 2, 1997 at 9:00 a.m. (the "Confirmation Hearing") to consider Confirmation of the Original Plan in accordance with 11 U.S.C. § 1129 and certain matters continued over from the April 1 Hearing. At the Confirmation Hearing, the Court confirmed the Original Plan in accordance with 11 U.S.C. § 1129.

27. On April 15, 1997, this Court entered its Order (A) Confirming Debtor's First Amended Plan of Reorganization, as Modified, Pursuant to 11 U.S.C. § 1129 and (B) Approving Transfer of Certain of Debtor's Assets to, and Assumption of Certain Obligations by, Lykes Lines Limited [Docket Entry No. 2804] (the "April 15 Confirmation Order"). The April 15 Confirmation Order is a final and non-appealable order. Except as expressly modified by this Confirmation Order, the April 15 Confirmation Order remains in full force and effect. Without limiting the foregoing, in the April 15 Confirmation Order, this Court made various findings of fact and conclusions of law regarding the Confirmation of the Original Plan, all of which findings of fact and conclusions of law the Court hereby finds are applicable to the Modified Plan and are incorporated herein in their entirety by this reference thereto.

28. Pursuant to the April 15 Confirmation Order, the occurrence of the Effective Date of the Original Plan, and the Debtor's obligation to consummate the Asset Purchase Agreement, were expressly subject to the satisfaction of the following conditions precedent, among others: (a) the receipt of the necessary approvals from (i) MarAd for the retention of the ODS Contract and the MSP Contracts by the Reorganized Debtor and the transfer from the Debtor to Newco of, and the retention of subsidy under, the Oceanus Class Time

Charter Agreements, and (ii) MSC for the continuing carriage by Newco of priority or preference cargo for the United States military, and (b) the existence of sufficient funds or the availability of other financial undertakings at Closing (as determined by the Debtor) to make the distributions required under the Original Plan (the "Effective Date Contingencies"). The April 15 Confirmation Order expressly found that the Original Plan could not be consummated unless and until the Effective Date Contingencies occurred.

29. In anticipation of and in order to satisfy the Effective Date Contingency relating to MarAd, on January 27, 1997, immediately following the execution of the Asset Purchase Agreement, the Debtor notified MarAd regarding (a) the retention by the Reorganized Debtor of the ODS Contract and the MSP Contracts as contemplated by the Asset Purchase Agreement and (b) the assumption and assignment of the Oceanus Class Time Charter Agreements by the Debtor to Newco, as contemplated by 46 U.S.C. § 1187a(j) and 46 C.F.R. § 295.20(i). On March 7, 1997, the Debtor further notified MarAd regarding the approvals requested for the proposed time charters of the subsidized vessels by the Reorganized Debtor to Newco and the proposed assumption and assignment of the Oceanus Class Time Charter Agreements by the Debtor to Newco.

30. As of the April 1 Hearing and the Confirmation Hearing, the Debtor, the Blue Water Entities, the CPL Entities and other parties expected that MarAd's decision would be forthcoming within a few weeks following those hearings. The Debtor, the Blue Water Entities, and the CPL Entities engaged in extensive discussions with MarAd for more than two months following the Confirmation Hearing in order to facilitate MarAd approval of the Original Plan. During the course of these negotiations, MarAd requested that the "Purchaser" under the Original Plan and the Asset Purchase Agreement be a United States citizen eligible to document

United States-flag vessels. In response to MarAd's request, Newco authorized the formation of the Purchaser as a Delaware limited liability company for the primary purpose of becoming a United States documentation citizen and the "Purchaser" under the Original Plan and the Asset Purchase Agreement.

31. Notwithstanding the best efforts of the Debtor, the Blue Water Entities and the CPL Entities, MarAd notified the Debtor by letter dated June 20, 1997 (the "June 20 Decision") that it was effectively disapproving the charter arrangements contemplated by the Original Plan and denying the "transfer" to the Reorganized Debtor of the ODS Contract and the MSP Contracts with respect to the Pacific Class Vessels. In the June 20 Decision, MarAd did not rule on the assignment and assumption of the Oceanus Class Time Charter Agreements by the Debtor to Newco. As a consequence of the June 20 Decision, neither the Debtor nor the Reorganized Debtor could consummate the Original Plan, which by its terms and as expressly stated in the April 15 Confirmation Order could not therefore become effective unless the Original Plan was modified in some respects and unless either: (a) the Blue Water Entities, the CPL Entities and the Purchaser agreed to waive or modify the condition that MarAd approval be required, or (b) the June 20 Decision was set aside or reversed.

32. Subsequent to the June 20 Decision, the Debtor met extensively with the CPL Entities and the Blue Water Entities in an attempt to restructure the Original Plan in a manner satisfactory to such parties. Although all parties strongly disagree with the June 20 Decision, both procedurally and on the merits, the Debtor, the Blue Water Entities and the CPL Entities have agreed, despite the June 20 Decision, to nonetheless close the transactions contemplated by the Asset Purchase Agreement, subject to certain changes to the form of the transaction, while expressly reserving their rights with respect to

the June 20 Decision, including their rights to seek administrative or judicial review of or appeal such decision. The primary change will be for the Debtor, the Blue Water Entities and the Purchaser to close notwithstanding the June 20 Decision that the Reorganized Debtor will be denied subsidy payments.

33. On June 30, 1997, the Debtor filed with the Court its Motion on Matters Related to the Maritime Administration [Docket Entry No. 3029] (the "MarAd Motion"). In general, the MarAd Motion sets forth the terms of various agreements reached between the Debtor and MarAd following the June 20 Decision as to certain matters within the scope of MarAd's jurisdiction. The MarAd Motion was served on all appropriate Creditors and parties in interest. Appropriate affidavits or certificates have been filed in the record regarding such service. On July 10, 1997, this Court entered the MarAd Order.

34. On July 1, 1997, the Debtor filed with the Court its Motion to Modify Confirmed Plan of Reorganization Pursuant to 11 U.S.C. § 1127(b) and to Modify Payment Terms of Shipyards Agreement [Docket Entry No. 3039] (the "Plan Modification Motion"). In general, the Plan Modification Motion sets forth a brief description of certain modifications to the Original Plan. The Debtor attached to the Plan Modification Motion as *Exhibit 1* its Third Modification to Debtor's First Amended Plan of Reorganization Pursuant to 11 U.S.C. § 1127(a) (the "Third Modification"). The Plan Modification Motion was served on all appropriate Creditors and parties in interest. Appropriate affidavits or certificates have been filed in the record regarding such service.

35. The Original Plan provided that the Effective Date of the Original Plan must occur on or before June 1, 1997, unless extended with the mutual consent of the Debtor and Newco. On June 18, 1997, in

order to memorialize the Debtor's and Newco's extension agreements, the Debtor filed its Motion to Extend Deadlines Related to Plan Consummation and Adequate Protection and Adopt Procedures for Modification of Confirmed Plan [Docket Entry No. 3017] (the "Extension Motion"). On July 1, 1997, this Court entered an order granting the Extension Motion which, among other things, extended all of the deadlines related to the Original Plan for 31 days to July 31, 1997.[6]

36. On July 8, 1997, the Debtor filed with the Court the Debtor's (A) Amendment to Motion on Matters Related to the Maritime Administration and (B) Conditional Motion to Reject FABC Charters [Docket Entry No. 3050A] (the "FABC Charters Motion"). In general, the FABC Charters Motion sets forth, *inter alia*, the Debtor's request for conditional rejection of the Oceanus Class Time Charter Agreements. The FABC Charters Motion was served on all appropriate Creditors and parties in interest. Appropriate affidavits or certificates have been filed in the record regarding such service.

### D. THE JULY 10, 1997, JULY 14, 1997 AND JULY 16, 1997 HEARINGS

37. The Court held a hearing on July 10, 1997 at 9:00 a.m. (the "July 10 Hearing") and on July 14, 1997 at 1:30 p.m. (the "July 14 Hearing") to consider the Plan Modification Motion and the FABC Charters Motion as well as any objections and responses filed thereto. As of the date of each of such hearings, the Original Plan had not been substantially consummated for purposes of 11 U.S.C. § 1127(b).

38. At the July 10 Hearing, the Court disposed of certain objections to the Plan Modification Motion by consent of the affected parties. At the July 14 Hearing, as more fully described below, the Court took various proffers of testimony, ruled on cer-

**6.** *The Amended and Restated Third Modification provides that the Effective Date of the Modified Plan shall occur on or before July 31,* 1997, *unless extended with the mutual consent of the Debtor and the Purchaser.*

tain additional objections and oppositions to the Plan Modification Motion, and continued such hearing as to certain unresolved matters to July 16, 1997 at 4:00 p.m. (the "July 16 Hearing"). On July 15, 1997, this Court entered that certain Order on Debtor's Motion to Modify Confirmed Plan of Reorganization Pursuant to 1127(b) and to Modify Payment Terms of Shipyards Agreement [Docket Entry No. 3073] (the "July 15 Order"), which addresses such issues as to the July 14 Hearing.

39. At the July 14 Hearing and/or the July 16 Hearing, the Debtor and its counsel, Harley E. Riedel, Russell M. Blain and Charles A. Postler, appeared; the Official Committee of Unsecured Creditors (the "Unsecured Creditors' Committee") was represented by Paul Steven Singerman or Mindy A. Mora, Canadian Pacific Limited and the Purchaser were represented by Jeffrey C. Steen and Carrie Lesser; the Morgan Bank Group was represented by Leonard Gilbert and Robert Soriano; Lykes Bros. Inc., Lykes Insurance, Inc. and Lykes Services Co. were represented by Thomas B. Mimms; the United States Trustee was represented by Cynthia Burnette; the Blue Water Entities were represented by Robert D. Drain or John Emmanuel; Mitsubishi Heavy Industries, Ltd. and Mitsui Engineering & Shipbuilding Co. Ltd. (collectively, the "Shipyards") were represented by Zala Forizs, Edward Cowen, David Fobes, and Martin Bunin: the Pension Benefit Guaranty Corporation ("PBGC") was represented by Lawrence F. Landgraff; APL was represented by Mark Wolfson; the United States of America, on behalf of MarAd, MSC, the Internal Revenue Service, and various other agencies and instrumentalities of the United States, was represented by Lacy R. Harwell; Barnett Bank of Florida was represented by Keith Fendrick; the MEBA Benefit Plans and First American Bulk Carrier Corporation ("FABC") were represented by Thomas Dillon and Alfred

Colby; the Marine Engineers Beneficial Association ("MEBA") was represented by Patrick Nakamura and Dennis Levine; Genstar Container Corporation ("Genstar") was represented by Debra A. Dandeneau; Transamerica Leasing, Inc. including its affiliate TransOcean Container Corp. (collectively, "Transamerica") were represented by John Olson; the South Carolina State Ports Authority ("SCSPA") was represented by Betsy L. Benedict; Bernard J. Morse, the Legal Representative, appeared; and various other creditors and parties in interest were represented by their respective counsel.

40. Immediately prior to the July 16 Hearing, the Debtor filed with the Court the Amended and Restated Third Modification, which amends and restates, and replaces and supersedes, in its entirety the Third Modification. At the July 16 Hearing, counsel for the Debtor distributed the Amended and Restated Third Modification to all parties present.

41. Written objections or oppositions to the Plan Modification Motion were filed by SCSPA, FABC, MEBA and the MEBA Benefit Plans.[7] A written response to the Plan Modification Motion was filed by the Morgan Bank Group. APL filed a conditional acceptance of the Modified Plan. As to such objections, oppositions and responses, the Court finds, based upon the evidence presented and the argument of counsel, as follows:

(a) the objection and response filed by FABC to the Plan Modification Motion (Docket Entry Nos. 3061 and 3069, respectively) should be overruled in all respects;

(b) the objections filed by MEBA to the Plan Modification Motion as set forth in paragraphs 1, 2, 4 and 5 of MEBA's opposition dated July 8, 1997 (Docket Entry No. 3052) were withdrawn at the July 14 Hearing and were therefore overruled in all respects by the July 15 Order. The \

---

7. *FABC was the only party to file an objection to the FABC Charters Motion, which objection* *has been overruled by this Court in the FABC Charters Order.*

objection filed by MEBA in paragraph 3 of MEBA's opposition was withdrawn by MEBA at the July 16 Hearing and, therefore, should be overruled in all respects;

(c) based upon certain agreed-upon language in this Confirmation Order, the objection filed by the MEBA Benefit Plans to the Plan Modification Motion (Docket Entry No. 3060) has been overruled in all respects by the July 15 Order;

(d) the objection filed by the SCSPA to the Plan Modification Motion (Docket Entry No. 3054) has been overruled in all respects by the July 15 Order;

(e) based upon certain agreed-upon language in this Confirmation Order, the response filed by the Morgan Bank Group to the Plan Modification Motion (Docket Entry No. 3065) was withdrawn by the Morgan Bank Group at the July 16 Hearing; and

(f) the conditional acceptance filed by APL to the Plan Modification Motion (Docket Entry No. 3063) was changed by APL to an unconditional acceptance at the July 16 Hearing.

42. Counsel for the Debtor announced at the July 14 Hearing that the Original Plan provided in Article 13.1.2 thereof that the Debtor could modify the Original Plan after the entry of the April 15 Confirmation Order to remedy any defect or omission or to reconcile any inconsistencies in the Original Plan or in the April 15 Confirmation Order, as may be necessary to carry out the purposes and effects of the Original Plan, provided that (a) the Debtor obtains approval of the Purchaser and this Court for such modification, after notice and a hearing, and (b) such modification does not materially or adversely affect the interests or rights of any of the CPL Entities or the interests, rights, treatment, or distributions of any non-consenting Class of Allowed Claims or Allowed Equity Interests under the Original Plan.

43. The Modified Plan classifies Claims and Equity Interests into 18 separate Classes. The following Classes of Claims are treated as unimpaired under the Modified Plan:

(a) Class 2 (Secured Claims of the SCSPA)

(b) Class 5 (Secured Claims of CNNI, CSAV and SLL (Rights of Setoff))

(c) Class 6 (Secured Claims of the LC Banks)

(d) Class 11 (Secured Claims (Maritime Liens), but only to the extent expressly provided in Article 4.12 of the Modified Plan)

(e) Class 14 (Unsecured Claims of Certain Underwriters, Insurers and Other Parties)

(f) Class 15 (Claims of APL under the APL Settlement Agreement)

44. Since the Claims included in Classes 2, 5, 6, 11 (as provided above), 14 and 15 are not impaired by the Modified Plan, the Holders thereof are conclusively presumed to have accepted the Modified Plan and are not entitled to vote on the Modified Plan pursuant to Section 1126(f) of the Bankruptcy Code.

45. The following Classes of Claims and Equity Interests are treated as impaired under the Modified Plan:

(a) Class 1 (Priority Claims)

(b) Class 3 (Secured Claims of the Morgan Bank Group)

(c) Class 4 (Secured Claims, if any, of LBI)

(d) Class 7 (Secured Claims of Barnett Bank)

(e) Class 8 (Secured Claims of Mitsui)

(f) Class 9 (Secured Claims of Mitsubishi)

(g) Class 10 (Claims of the Blue Water Entities)

(h) Class 11 (Secured Claims (Maritime Liens), but only to the extent expressly provided in Article 4.12 of the Modified Plan)

(i) Class 12 (Claims of PBGC)

(j) Class 13 (Certain Unsecured Claims of the Union Plans)

(k) Class 16 (Unsecured Claims (Unsecured Claims Not Otherwise Classified))

(*l*) Class 17 (Tort Claims)

(m) Class 18 (Equity Interests)

46. The Court finds that Lykes Bros. Inc., the sole Class 4 claimant, has been determined to hold only Class 16 Claims and that Class 4 is, therefore, an "empty" class. The Court finds that the sole Creditor in each of Classes 3, 8, 9, 10 and 12 has accepted the Modified Plan. The Court further finds that, based upon the re-casting of Ballots at the Confirmation Hearing by the Legal Representative · and the MALC Asbestos Claimants (through Alan Kellman). Class 17 has overwhelmingly (almost 100%) accepted the Modified Plan in the requisite number and amount required under Section 1126 of the Bankruptcy Code. The Holders of Claims and Equity Interests in all other impaired Classes, including Class 16, have either accepted the Modified Plan in the requisite number and amount required under Section 1126 of the Bankruptcy Code or, as provided in a separate order of this Court granting the Motion for Cramdown, are subject to cramdown.

47. At the July 10 Hearing, the July 14 Hearing, the July 16 Hearing and at a hearing held on July 24, 1997, counsel for the Debtor advised the Court and all parties of the circumstances surrounding the Plan Modification Motion and various aspects of the Modified Plan and the events leading up to the formulation of the Modified Plan, including, for example, the Debtor's extensive efforts to obtain MarAd approval following the Confirmation Hearing, the consequences of the June 20 Decision, the arm's-length negotiation of the Third Modification, the Amended and Restated Third Modification, the MarAd Motion, the FABC Charters Motion and the FABC Charters Order, the feasibility of the Modified Plan, the absence of any meaningful alternative to the transactions contemplated by the Modified Plan, the likely effect of liquidation upon Creditors and other interested parties, and the means for implementing the treatment of and distributions to Creditors and Holders of Administrative Claims and Priority Tax Claims pursuant to the Modified Plan. The Court finds that these statements were made in open Court and in the presence of numerous Creditors, none of whom objected to these statements or the underlying facts, notwithstanding ample opportunity to do so. The Court further finds that the statements and comments of counsel for the Debtor in support of the Plan Modification Motion and the Modified Plan were unchallenged and unrebutted, were not subject to objection, and should be accepted. The Debtor's counsel's statements were, in many instances, also supported by and consistent with the statements of significant Creditor constituencies and were consistent with the entire record of this Chapter 11 case, over which this Court has presided from the outset.

48. In particular, the Court finds that, based upon the entire record:

(a) The Modified Plan has been proposed in good faith by the Debtor following extensive arm's-length negotiations by and among the Debtor and Secured Creditors, Unsecured Creditors, parties to executory contracts, the Blue Water Entities, and Canadian Pacific Limited and the Purchaser.

(b) Based upon the Purchaser's agreement to pay the Purchase Price Proceeds to the Debtor and to assume the Assumed Obligations upon Closing pursuant to the terms of the Asset Purchase Agreement, and the agreement among the vast majority of the significant administrative and priority claimants to accept a reduction in the Allowed Amount of their Administrative Claims, Priority Claims, and Priority Tax Claims, and assuming no adverse change between the July 16 Hearing and the

Closing, the Debtor's Estate will have sufficient funds and other means as of the expected Effective Date to pay, reserve for or escrow all Allowed or Disputed Priority Claims, Priority Tax Claims and Administrative Claims in the amounts required under the Bankruptcy Code or in such lesser amounts as agreed upon by the parties. No reserve for Disallowed Claims is provided or is required by law or by the Modified Plan.

(c) Based upon the liquidation analysis performed by the Debtor in accordance with Section 1129(a)(7) of the Bankruptcy Code, the Debtor's accounts receivable—which constitute by far the largest asset on the Debtor's balance sheet—are encumbered by valid and enforceable Liens well in excess of the likely liquidation value of those receivables. In addition, the total realizable value of the Debtor's other assets is significantly less than the cumulative amount of existing Administrative Claims. Accordingly, there is no realistic possibility of any distribution to Unsecured Creditors in the event this case were converted to a case under Chapter 7.

(d) The Asset Purchase Agreement, the Amended and Restated Third Modification and related transactions preserve the going concern value of the Debtor at a price that resulted from an extensive search and marketing process and good faith arm's-length negotiations. The Modified Plan, therefore, satisfies Section 1129(b) of the Bankruptcy Code and is fair and equitable.

(e) At present, there is no meaningful or realistic way to preserve the Debtor's business or the 1,000 jobs in the United States and overseas, and the thousands of ongoing trade creditor relationships associated therewith other than the prompt Confirmation and consummation of the Modified Plan.

(f) The Modified Plan is feasible, and the Confirmation and consummation of the Modified Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtor under the Bankruptcy Code.

49. In further support of Confirmation of the Modified Plan, on July 14, 1997, the Debtor and the Purchaser proffered (without objection) the testimony and an affidavit of Ian Webber, the Chief Financial Officer of the Purchaser, regarding the feasibility of the Modified Plan and the adequate assurance of future performance under the Acquired Contracts. In his affidavit, Mr. Webber also attested that it is contemplated that, pursuant to the Modified Plan, Florida Vessel Management, L.L.C. (the "Ship Management Company") will be owned 75% by either the Purchaser or the Reorganized Debtor and 25% by the PBGC, and will, among other things, be assigned the Debtor's Union Contracts (as modified) and certain Union Plans, subject to the terms and conditions of the Modified Plan. Although Mr. Webber was present in the Courtroom, no party objected to the proffer of his testimony or the submission of his affidavit or requested an opportunity to cross-examine Mr. Webber.

50. In particular, the unrebutted proffered testimony of Mr. Webber established that the Purchaser and CP Ships Holdings Inc. each has the ability and economic wherewithal to perform its respective financial and other obligations, if any, on and after the Closing Date, pursuant to the Asset Purchase Agreement, the Assumption Agreement, the Reorganized Debtor Term Sheet, the Pacific Class Bareboat Charter Agreements, the APL Letter Agreement, the Shipyards Agreement, the Acquired Contracts, and the various other agreements executed or to be executed by the Purchaser or CP Ship Holdings Inc. in connection with the Modified Plan and the Asset Purchase Agree-

ment, subject to and in accordance with the terms and conditions of such agreements. Mr. Webber's testimony also established that the Purchaser is a United States documentation citizen. Mr. Webber's affidavit also stated that the substitution of the Purchaser in lieu of the Reorganized Debtor as 75% owner of the Ship Management Company under the Modified Plan would not adversely affect any of the Debtor's Creditors, equity security holders or other parties in interest, and would not affect, impede or interfere with the ability and economic wherewithal of the Ship Management Company to perform its obligations on and after the Closing Date pursuant to the Modified Plan, any of the Union Contracts or Union Plans assigned to the Ship Management Company under the Modified Plan, or the Salaried Pension adopted by the Ship Management Company under the Modified Plan, subject to and in accordance with the terms and conditions of the Modified Plan and this Confirmation Order.

51. The Court hereby accepts the proffered testimony of Mr. Webber and finds that such testimony supports the feasibility of the Modified Plan under Section 1129(a)(11) of the Bankruptcy Code and establishes adequate assurance of future performance under each Acquired Contract for all purposes, including Section 365(b)(1)(C) of the Bankruptcy Code.

52. The Court hereby finds that, pursuant to the terms of the Modified Plan and subject to the approval of the Court, at the Closing:

(a) the Debtor will sell, transfer and assign the Acquired Assets to the Purchaser free and clear of any and all Liens, Claims and encumbrances, with the sole exception of Permitted Encumbrances;

(b) the Purchaser will assume the Assumed Obligations in accordance with the terms and conditions of the Asset Purchase Agreement and the Assumption Agreement;

(c) the Excluded Assets, except as otherwise provided in the Modified Plan and the Reorganized Debtor Term Sheet, will be revested in or transferred to the Reorganized Debtor free and clear of any and all Liens, Claims and encumbrances, except for the first preferred ship mortgages and other liens to be granted to the Shipyards as to the Pacific Class Vessels and related assets in accordance with the terms of the Shipyards Agreement; and

(d) the Purchaser will bareboat charter the Pacific Class Vessels from the Reorganized Debtor under the Pacific Class Bareboat Charter Agreements, and the Debtor or the Reorganized Debtor, as appropriate, will enter into and execute other documents with respect to the Pacific Class Bareboat Charter Agreements in accordance with the terms of the Shipyards Agreement.

53. Under the Modified Plan, the Reorganized Debtor will initially remain as the owner and/or operator of four United States-flagged vessels (i.e., the Pacific Class Vessels) [8] and will also remain a "Section 2 Citizen." The Ship Management Company will be responsible for crewing these vessels and this Court hereby authorizes the Ship Management Company to accept the assignment, at Closing, of the Union Contracts (as modified) with the Unions which are being assumed pursuant to the terms and conditions of the Modified Plan and this Confirmation Order.

---

**8.** *Pursuant to that certain Transfer Order No. MA–13323 issued by MarAd on July 3, 1997, the Reorganized Debtor may transfer the M/V GENEVIEVE LYKES from a United States— flagged vessel to a vessel under Effective United States Control registry and flag. The Blue Water Entities, which will own the stock of the Reorganized Debtor, have (particularly in light of the June 20 Decision) reserved all rights with respect to all of the Pacific Class Vessels.*

54. The Modified Plan, the statements of counsel, the testimony and proffered testimony, the affidavits on file, and the entire record reveal that the sale of the Acquired Assets to, and the assumption of the Assumed Obligations by, the Purchaser, the Purchaser's bareboat charter of the Pacific Class Vessels from the Reorganized Debtor, and the ownership of the Reorganized Debtor by United States Citizens will provide a significant benefit to all Creditors and will provide for payments to be made on account of Allowed Administrative Claims, Priority Claims, Priority Tax Claims, Secured Claims, and Unsecured Claims.

55. The Court hereby finds that the Debtor, the Purchaser, the Blue Water Entities, and the other CPL Entities have each acted in good faith in connection with the formulation and negotiation of the Modified Plan and the various documents and agreements related thereto, and the negotiation, execution and implementation of the Asset Purchase Agreement and the Assumption Agreement. Without limiting the foregoing, the Asset Purchase Agreement has been negotiated in good faith, at arm's-length, and not by any means forbidden by law. The Court specifically finds that the Purchaser and the other CPL Entities have acted in good faith in pursuing and closing the transactions contemplated under the Modified Plan and the Asset Purchase Agreement for purposes of Section 363(m) of the Bankruptcy Code or otherwise.

56. The Court hereby finds that the offer evidenced by the Asset Purchase Agreement and the Assumption Agreement constitutes the highest and best offer for the Acquired Assets.

57. The Court expressly finds that, in connection wit the assumption and/or assignment by the Debtor of each of the Acquired Contracts (including without limitation the Selected Contracts and the Lykes Lines Contracts) to the Purchaser, (a) the Debtor has satisfied each of the applicable requirements of the Bankruptcy Code, including without limitation 11 U.S.C. §§ 365(b)(1)(A), (b)(1)(B) and (b)(1)(C), 365(d)(2) and (d)(3), and 1123(b)(2); (b) there are no defaults, Claims or Cure Claims due and owing as of the Effective Date under or in connection with any Acquired Contract, other than the FABC Cure Claim which is dealt with by the FABC Charters Order; and (c) neither the Reorganized Debtor nor any of the CPL Entities shall, or shall be deemed to, have any liability whatsoever in connection with or relating to any alleged default, Claim, Cure Claim, or any other amount (whether monetary or non-monetary) that arose or accrued prior to the Effective Date under or in connection with any Acquired Contract, with the sole exception of (i) any amounts that expressly constitute Assumed Obligations under and subject to the terms and conditions of the Asset Purchase Agreement and Assumption Agreement, and (ii) the FABC Cure Claim.

58. The Court hereby finds that the Debtor's execution of the Asset Purchase Agreement was and continues to be appropriate and in the best interests of the Debtor, its Creditors and the Estate.

## E. THE LYKES LINES COMPROMISE

59. The Court finds that, pursuant to the Asset Purchase Agreement, certain assets of Lykes Lines, currently encumbered by a security interest in favor of the Debtor and by certain inchoate liens of the PBGC, will be conveyed to the Purchaser free and clear of all Liens, Claims and encumbrances (other than Permitted Encumbrances) at the Closing, and that under the Modified Plan the issued and outstanding common stock of Lykes Lines and all other Subsidiaries shall be cancelled and/or abandoned as of the Effective Date.

60. It is an express condition to the Purchaser's obligation to close under the Asset Purchase Agreement that those as-

sets of Lykes Lines which constitute Acquired Assets be conveyed to the Purchaser free and clear of any and all Claims, causes of action, Liens, security interests, interests, and other encumbrances in accordance with the terms of the Asset Purchase Agreement.

61. The Asset Purchase Agreement, the Modified Plan and the Executory Contract Order contemplate that all or virtually all of the Lykes Lines Contracts will be assigned by Lykes Lines to the Debtor prior to the Closing Date, that such Lykes Lines Contracts will then be assumed by the Debtor and assigned to the Purchaser as of the Closing Date, and that the obligations arising under such Lykes Lines Contracts after the Closing Date will be assumed by the Purchaser, in each case in accordance with the terms of the Asset Purchase Agreement, the Assumption Agreement and the Executory Contract Order. The Lykes Lines Contracts are set forth on *Exhibit E* to the Amended and Restate Third Modification.

62. The Court finds that it is appropriate under the circumstances to authorize the Debtor to foreclose upon, and to receive the transfer of title to, the assets of Lykes Lines (collectively, with the Lykes Lines Contracts, the "Lykes Lines Assets") in accordance with the Debtor's Motion to Enter into Compromise with Lykes Lines, Inc. and to Accept Assignment of Contracts and Foreclose upon Certain Assets of Lykes Lines, Inc. in exchange for Relinquishment by Debtor of Certain Claims against Lykes Lines, Inc. dated March 28, 1997 (the "Motion to Compromise with Lykes Lines") and the Modified Plan, in order to facilitate the consummation of the Modified Plan and the Closing of the Asset Purchase Agreement. At the outset, the Court finds that the Debtor has a valid and enforceable first-priority secured claim against all of the Lykes Lines Assets in the amount of $665,000. The Debtor's foreclosure upon, and its receipt of the transfer of title to, the Lykes Lines Assets (including the Lykes Lines Con-

tracts) in exchange for the Debtor's credit bid and relinquishment of its $665,000 valid and enforceable first-priority secured claim in accordance with the Motion to Compromise with Lykes Lines and the Modified Plan (a) is commercially reasonable in all respects, and adequate notice of such foreclosure was given for all purposes under Section 9–504 of the Florida Uniform Commercial Code and otherwise, (b) is a fair and reasonable transaction and is in the best interests of the Debtor's Estate and the creditors of Lykes Lines, (c) was appropriately noticed to parties in interest, and (d) is a necessary condition precedent to the Purchaser's willingness to close the transactions contemplated by the Asset Purchase Agreement and to consummate the Modified Plan. The Court further finds that the transfer of the Lykes Lines Assets (including the Lykes Lines Contracts) by Lykes Lines to the Debtor in accordance with the Motion to Compromise with Lykes Lines and the Modified Plan was and shall be deemed to be for reasonably equivalent value and fair consideration actually received by Lykes Lines, including, without limitation, the relinquishment and discharge of the valid and enforceable first-priority secured claim of the Debtor in the amount of $665,000 and substantial direct and indirect economic benefits such as the assumption by the Purchaser of the Lykes Lines Contracts.

63. The sale of the Acquired Assets to the Purchaser, including the sale by the Debtor to the Purchaser of the Lykes Lines Assets, is commercially reasonable in all respects, constitutes a transfer for reasonably equivalent value and fair consideration, and is in the best interests of the Debtor's Estate and creditors of Lykes Lines.

### F. FACTUAL FINDINGS RELATED TO THE JULY 14 HEARING AND THE JULY 16 HEARING

64. The Court finds that, absent the sale of the Acquired Assets to the Pur-

chaser, including the sale of the Lykes Lines Assets, only two alternatives remain: the dismissal of the Debtor's Chapter 11 case or the conversion of the Debtor's Chapter 11 case to a case under Chapter 7. Under either alternative, however, the unsecured creditors of both the Debtor and Lykes Lines are virtually assured of no recovery whatsoever. Moreover, many of the Debtor's and Lykes Lines' creditors would lose a valuable trading partner if the Debtor is liquidated. Many Secured and priority Creditors will likewise receive significantly smaller distributions, and parties to leases and executory contracts will face defaults under those leases and contracts rather than an assumption by the Purchaser. Finally, conversion or dismissal of the Debtor's case would promptly result in the loss of jobs for more than one thousand employees. The Court thereby finds that only through the sale of the Acquired Assets (including the Lykes Lines Assets) pursuant to the Asset Purchase Agreement will the creditors of both the Debtor and Lykes Lines realize anything of meaningful economic value.

65. The Court also finds that prompt Confirmation of the Modified Plan is in the public interest. The Debtor's survival is in the national interest of the United States. The Debtor is one of the last few United States flag carriers engaged in international commerce. Between 1970 and the present, some sixteen United States flag carriers have gone out of business. The Court hereby determines that the reorganization of the Debtor under Chapter 11 pursuant to the Modified Plan is in the public interest, and is the only way to preserve (a) the business of this historic, 100-year old American shipping company and (b) the 1,000 jobs that would be lost if it ceased business operations.

66. Nothing in this Confirmation Order, the Amended and Restated Disclosure Statement, the Modified Plan and/or any other instrument or agreement, notwithstanding anything to the contrary therein, shall be construed to be or deemed to be in any manner an alteration, modification, variance, amendment, waiver or any other type of change to the terms and conditions of the applicable Rules and terms and conditions of coverage by MOAC, the UK P & I Club and Steamship Mutual applicable to the Debtor and/or any agent acting on behalf of the Debtor.

67. The Court finds that the Modified Plan and this Confirmation Order, including without limitation the channeling injunction and related provisions of Article 9 of the Modified Plan and the discharge, release, limitation of liability, general injunction and other related provisions of Article 11 of the Modified Plan, are binding upon any and all Tort Claimants, including without limitation any and all Future Claimants, and that any and all Tort Claimants, including without limitation any and all Future Claimants, received sufficient, fair and proper notice, actual or constructive, of and representation in connection with the Modified Plan and this Confirmation Order.

68. Based on the foregoing and the overall record in this case, the Court hereby finds that the Tort Claims Trust provisions (Article 9) of the Modified Plan, including the channeling injunction and related provisions therein, the Tort Claims Resolution Procedures and the Tort Claims Trust Agreement are fair, equitable, reasonable and proper, are in the best interests of the Debtor's Estate and Creditors (including Tort Claimants), and are a necessary and material condition precedent to the Purchaser's and the Blue Water Entities' willingness to close the transactions contemplated by the Asset Purchase Agreement and the Modified Plan.

69. The Court further finds that all of the discharge, release, limitation of liability, general injunction and other related provisions of the Modified Plan, including those set forth in Article 11 of the Modified Plan and those limiting recourse for recovery of any withdrawal or partial withdrawal liability (past, present or future)

relating to or resulting from any underfunding that existed on or before the Effective Date, are fair, equitable, reasonable and proper, are in the best interests of the Debtor's Estate and Creditors (including Tort Claimants), and are a necessary and material condition precedent to the Purchaser's and the Blue Water Entities' willingness to close the transactions contemplated by the Asset Purchase Agreement and the Modified Plan. With respect to any underfunding that existed on or before the Effective Date with respect to the Union Plans, the Claims of the Union Plans shall be channeled exclusively to the proceeds of any recapture received by the Debtor under the ODS Contract specifically on account of Class 13 Claims in accordance with Article 4.14 of the Modified Plan. Proceeds from the ODS Contract that are not specifically earmarked to pay Class 13 Claims (including, without limitation, the approximately $2.8 million refund owing to the Debtor as a result of Addendum No. 121 to the ODS Contract) shall be paid to Joe B. Freeman, as Plan Distribution Trustee, in trust for the sole and exclusive benefit of the Purchaser, for distribution in accordance with Articles 7.6.1, 8.1.4.6 and 8.1.7 of the Modified Plan.

70. The Court also finds that the terms and conditions of the PBGC/SEPP Agreement are fair, equitable, reasonable and proper, are in the best interests of the Debtor's Estate and Creditors, and are an essential condition of the Modified Plan and the Purchaser's and the Blue Water Entities' willingness to close the transactions contemplated by the Asset Purchase Agreement and the Modified Plan.

71. The Court further finds that, subject to the "Reduction Conditions" (as defined below), (a) the Shipyards have not objected to a five percent (5%) reduction in the original principal balance of the amended and restated promissory notes to be executed by the Reorganized Debtor as to the Pacific Class Vessels, (b) the Morgan Bank Group has agreed to a five percent (5%) reduction in the amount of the Morgan Bank Group Cash Distribution set forth in the Original Plan, (c) Genstar and Transamerica have agreed to a reduction of at least five percent (5%) in the existing balances owed to them under their container leases, and (d) the "bellwether" Administrative Claimants, and the various Holders of Allowed Administrative Claims which have agreed to parallel terms, have agreed to reduce by five percent (5%) the aggregate amount of approximately $6.7 million that would have been paid to them under the Original Plan.

72. The Court also finds that, pursuant to 11 U.S.C. § 1123(b)(3) and Bankruptcy Rule 9019(a), the Debtor has demonstrated that each of the compromises and settlements reflected or referenced in the Modified Plan, or announced by the Debtor's counsel at the July 14 Hearing or the July 16 Hearing, is fair, equitable, reasonable and proper and is in the best interests of the Debtor's Estate and Creditors.

73. With respect to the requirements of 11 U.S.C. § 1129(a) as applicable to the Modified Plan, the Court finds as follows:

A. Copies of the Third Modification and the Plan Modification Motion were mailed to all appropriate Creditors and Holders of Equity Interests of the Debtor and parties in interest as shown on the Court's master service list for this case, in accordance with this Court's orders. Copies of the Amended and Restated Third Modification were distributed or made available at the July 16 Hearing to all parties affected by changes made to the Third Modification. The Court hereby expressly finds that (i) timely and proper notice of the July 10 Hearing, the July 14 Hearing and the July 16 Hearing and the time fixed for filing objections to the Plan Modification Motion was given to all appropriate Creditors and Holders of Equity Interests of the Debtor and all parties in interest, including the Legal Representative, (ii) such notice was adequate and sufficient to notify all appropriate Creditors and Holders of Equity Interests of the Debtor and all parties in interest, in-

cluding the ·Legal Representative, of the July 10 Hearing, the July 14 Hearing and the July 16 Hearing and the objection deadline to the Plan Modification Motion, and (iii) such notice complied in all respects with the procedural orders of this Court, the Bankruptcy Code, the Bankruptcy Rules, including without limitation Bankruptcy Rules 2002, 3018, 3019, and 9006, and the Local Rules, and otherwise satisfied the requirements of due process.

B. The Debtor has acted in good faith and complied in all respects with Section 1125 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, all procedural orders of this Court, all other applicable provisions of the Bankruptcy Code and all other applicable laws, rules and regulations.

C. The Modified Plan complies with each of the applicable provisions of Title 11 of the United States Code, including without limitation the provisions of 11 U.S.C. §§ 1122 and 1123.

D. As required by Section 1129(a)(2) of the Bankruptcy Code, the Debtor, as the proponent of the Modified Plan, has complied with the applicable provisions of Title 11 of the United States Code. Without limiting the generality of the foregoing and by way of example, the Debtor has complied with the disclosure and solicitation requirements of Sections 1125 and 1126 of the Bankruptcy Code. Further, the Court expressly finds that the Amended and Restated Disclosure Statement, the Amended Summary Disclosure Statements, the Amended Summary Plan, and the Modified Plan contain adequate information for purposes of 11 U.S.C. § 1125 with respect to the subject matter of the Amended and Restated Third Modification, and that no further disclosure is required by the Debtor in connection with the Modified Plan.

E. The Modified Plan has been proposed in good faith and not by any means forbidden by law.

F. The provisions regarding discharge, release, limitation of liability and of re-course, and injunctions set forth in the Modified Plan are an essential element of the performance of and consent to the Modified Plan and related documents by the Released Parties and the Protected Parties, including the CPL Entities and the Blue Water Entities, are proposed in good faith, are equitable and are supported by valid consideration.

G. Any payment made or to be made by the Debtor, in its capacity as debtor or as proponent of the Modified Plan, or by any person issuing securities or acquiring property under the Modified Plan, for services or for costs and expenses in or in connection with this case, or in connection with the Modified Plan and incident to this case, has been fully disclosed to the Court and has been approved by, or is subject to the approval of, the Court as reasonable.

H. The identity and affiliations of all persons who are to serve as directors or officers of the Reorganized Debtor or a successor to the Debtor under the Modified Plan after Confirmation of the Modified Plan have been fully disclosed, and the appointment of such persons to such offices, or their continuance therein, is equitable and is consistent with the interests of the Creditors and Holders of Equity Interests and with public policy.

I. The identity of, and the nature of any compensation for, any insiders that will be employed or retained by the Reorganized Debtor have been fully disclosed.

J. No governmental regulatory commission now has, or will have after Confirmation of the Modified Plan, jurisdiction over any rates of the Debtor or the Reorganized Debtor.

K. With respect to each impaired Class of Claims or Equity Interests, each Holder of a Claim or Equity Interest of such Class (i) has accepted the Modified Plan or (ii) will receive or retain under the Modified Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Modified Plan, that is not less than the amount that such Holder

would so receive or retain if the Debtor were liquidated under Chapter 7 of Title 11 of the United States Code on such date.

L. With respect to each impaired Class of Claims or Equity Interests, (i) each such Class has accepted the Modified Plan or (ii) is subject to cramdown.

M. Given (i) the risks, costs and delays that would result from continued litigation, including continued prosecution of the Blue Water Appeal, (ii) the substantial contribution to the confirmation process made by the Blue Water Entities in ensuring continued Section 2 Citizen status, (iii) the immediate equity value on the Confirmation Date of the Reorganized Debtor Common Stock, and (iv) the absence of any economic interest of Blue Water in the Pacific Class Vessels as previously determined by the Court in connection with its approval of the Shipyards Agreement, the Debtor's compromise and settlement with the Blue Water Entities under Article 4.11 of the Modified Plan is fair, equitable and reasonable and is in the best interests of the Debtor's Estate and Creditors.

N. Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Modified Plan provides that, with respect to a Claim of a kind specified in 11 U.S.C. § 507(a)(1) or § 507(a)(2), on the Effective Date of the Modified Plan, the Holder of such Claim will receive on account of such Claim cash equal to the Allowed Amount of such Claim.

O. Several impaired Classes of Claims have accepted the Modified Plan, determined without including any acceptance of the Modified Plan by any insider holding a Claim of such Class.

P. Confirmation of the Modified Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, the Reorganized Debtor, or any successor thereof under the Modified Plan. The Debtor has demonstrated the likelihood that it will be able to meet its financial and other obligations under the Modified Plan and documents ancillary thereto and the ability of the other major parties in interest to meet their financial and other obligations, if any, under the Modified Plan and documents ancillary thereto. The Modified Plan is feasible.

Q. The Modified Plan provides that all fees payable under 28 U.S.C. § 1930 through the date of entry of this Confirmation Order will be paid on the Effective Date of the Modified Plan. The Debtor and the United States Trustee have agreed upon all future payments of such fees, which will be prepaid on the Effective Date.

R. The Debtor has no "retiree benefits" (as such term is defined in Section 1114 of the Bankruptcy Code) payable pursuant to 11 U.S.C. § 1114, except as may be provided in any Union Contracts (as modified with the consent of the parties) which Union Contracts are to be assumed by the Debtor under the Modified Plan and assigned on the Effective Date to the Ship Management Company, subject to the terms and conditions of the Modified Plan and this Confirmation Order. Without limiting the foregoing, based on the record in this case, the Court hereby finds that, for purposes of Section 1129(a)(13) of the Bankruptcy Code, as of the date of entry of this Confirmation Order, the Debtor was not obligated under applicable law to provide or pay any retiree benefits. The Court also finds that any retiree benefits to which retired employees of the Debtor may have been entitled to as of the Petition Date were terminable under applicable nonbankruptcy law and were in fact effectively terminated by the Debtor during the pendency of this case. Accordingly, under the circumstances, the Court finds that Bankruptcy Code Section 1114 does not require the appointment of a non-collective bargaining retirees' committee and that the Modified Plan complies with 11 U.S.C. § 1129(a)(13).

S. The Modified Plan has been accepted in writing by the requisite majorities of

the Classes of Creditors and Holders of Equity Interests whose acceptance is required by law. The Court expressly finds that neither the Modified Plan nor this Confirmation Order adversely affects or changes the treatment of the Claim of any Creditor or the interest of any Holder of Equity Interests of the Debtor which has not accepted in writing the Amended and Restated Third Modification. Without limiting the foregoing, the Court specifically finds that the treatment of Class 16 Claims and Class 17 Claims has not been adversely or materially altered. Accordingly, in accordance with 11 U.S.C. § 1127(d), the Modified Plan shall be and is hereby deemed accepted by all Creditors and Holders of Equity Interests of the Debtor who have previously accepted the Original Plan. No further solicitation or resolicitation of acceptances of the Modified Plan is required under the circumstances. The Court expressly finds that circumstances warrant the Amended and Restated Third Modification and that the Debtor has complied with each of the requirements of 11 U.S.C. §§ 1127(b) and 1127(c) with respect to the Modified Plan and the Amended and Restated Third Modification.

T. With respect to Confirmation of the Modified Plan, all other requirements of 11 U.S.C. § 1129 have been met.

The Court having made the above findings, it is, accordingly,

ORDERED, ADJUDGED AND DECREED that the findings of fact set forth above in this Confirmation Order be, and the same hereby are, ratified and adopted as findings of this Court and are incorporated herein. It is further

ORDERED, ADJUDGED AND DECREED that to the extent any of the findings of fact set forth above are deemed to be conclusions of law, then such findings of fact are hereby confirmed as conclusions of law. It is further

ORDERED, ADJUDGED AND DECREED that the Modified Plan be, and the same hereby is, confirmed in all respects. The Effective Date of the Modified Plan, and the Debtor's obligation to consummate the Asset Purchase Agreement, shall, however, be subject to the satisfaction of the following condition precedent: the existence of sufficient funds or the availability of other financial undertakings at Closing (as determined by the Debtor) to make the distributions required under the Modified Plan (the "Modified Effective Date Contingency"). The Modified Plan cannot be consummated unless and until the Modified Effective Date Contingency has been satisfied. In the event the Modified Effective Date Contingency has not been satisfied on or before August 15, 1997, the Debtor and the Purchaser shall have the option to agree to extend the period for such Modified Effective Date Contingency to occur as they may deem necessary. It is further

ORDERED, ADJUDGED, AND DECREED that the Plan Modification Motion be, and the same hereby is, granted in all respects.[9] It is further

ORDERED, ADJUDGED AND DECREED that the Debtor has complied in all respects with the provisions of 11 U.S.C. § 1127 and the applicable Bankruptcy Rules with respect to the Amended and Restated Third Modification. It is further

ORDERED, ADJUDGED AND DECREED that the Debtor is authorized and directed to take all such steps as may be necessary to effectuate and implement the Modified Plan, including, without limitation, the execution and delivery of all instruments of transfer and other documents (both before and after the Closing) necessary to consummate the Asset Purchase Agreement and the transactions contemplated thereby and the various other documents, agreements, and instruments contemplated by the Modified Plan and the various settlements, agreements and com-

9. *The Plan Modification Motion has also been* *granted by separate order of this Court.*

promises referenced therein, including without limitation the Shipyards Agreement, the Reorganized Debtor Term Sheet, the APL Letter Agreement and the PBGC/SEPP Agreement. It is further

ORDERED, ADJUDGED AND DECREED that the form and substance of the Asset Purchase Agreement and the transactions contemplated thereby are hereby approved in all respects. After the date of entry of this Confirmation Order, the Debtor, Newco, and the Purchaser may modify or amend and restate the Asset Purchase Agreement filed with this Court as they deem necessary to consummate the Closing thereunder without further Court approval, including without limitation to incorporate the provisions of the Amended and Restated Third Modification and the consequences resulting from the June 20 Decision; provided, however, that no such modification or amendment and restatement shall change the treatment proposed to any Class of Creditors under the Modified Plan. It is further

ORDERED, ADJUDGED AND DECREED that, subject to the terms and conditions of the Modified Plan and the Asset Purchase Agreement, the Debtor shall be, and hereby is, authorized and directed to (a) sell, transfer, assign and deliver the Acquired Assets (including the Lykes Lines Assets) to the Purchaser free and clear of any and all Liens, Maritime Liens, Claims, Debts, obligations, Cure Claims, Liabilities, Equity Interests, causes of action, mortgages, pledges, security interests, encumbrances, and all other interests of any kind and nature (with the sole exception of the Permitted Encumbrances), subject to the payment by the Purchaser of the Purchase Price Proceeds (less the $2,000,000 amount of Debtor in Possession Financing) and the Purchaser's assumption of the Assumed Obligations in accordance with the terms and conditions of the Asset Purchase Agreement; and (b) execute and deliver all documents and take all other actions necessary or desirable to evidence or consummate the foregoing.

Such transactions shall be deemed to be pursuant to and under the Modified Plan as confirmed by the Court. It is further

ORDERED, ADJUDGED AND DECREED that the Debtor shall not be regarded as a successor of Lykes Lines and shall assume no obligations of Lykes Lines except for the PBGC Claim, which will be discharged at Closing in accordance with the PBGC/SEPP Agreement. After foreclosing upon and receiving the transfer or assignment of title to the Lykes Lines Assets in accordance with the Modified Plan, the Debtor is hereby authorized and directed to, upon Closing, transfer the Lykes Lines Assets to the Purchaser, subject to the terms and conditions of the Asset Purchase Agreement, free and clear of any and all Liens. Maritime Liens, Debts, obligations. Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature. It is further

ORDERED, ADJUDGED AND DECREED that the Class 12 Claims of the PBGC shall be treated in accordance with the PBGC/SEPP Agreement, and the PBGC Claim shall be deemed withdrawn, with prejudice, in its entirety. It is further

ORDERED, ADJUDGED AND DECREED that the Purchaser shall assume in full all of the Assumed Obligations set forth in, and subject to the terms and conditions of, the Assumption Agreement and shall take title to the Acquired Assets (including the Lykes Lines Assets). It is further

ORDERED, ADJUDGED AND DECREED that, on the Effective Date, all of the Acquired Assets (including the Lykes Lines Assets) shall vest in the Purchaser free and clear of any and all Liens, Maritime Liens, Debts, obligations, encumbrances, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature (except for any Permitted Encumbrances and subject to the Shipyards Agreement); provided, how-

ever, that the Acquired Assets do not include the Pacific Class Vessels or any spare parts related thereto. It is further

ORDERED, ADJUDGED AND DECREED that, on the Effective Date, except as otherwise expressly provided in the Modified Plan and the Reorganized Debtor Term Sheet, the Reorganized Debtor shall be revested with all of the Excluded Assets (including without limitation (i) any rights the Debtor has or may have as of the Effective Date under or in connection with the MSP Contracts and the ODS Contract (except for payments due under the ODS Contract for pre-Effective Date voyages, which shall vest in the Plan Distribution Trustee pursuant to the Modified Plan) and (ii) any claims or causes of action the Debtor has or may have against MarAd relating to, arising from, or on account of the June 20 Decision), free and clear of any and all Liens, Maritime Liens, Debts, obligations, encumbrances, Claims, Cure Claims. Liabilities, Equity Interests, and all other interests of every kind and nature (except for the first preferred ship mortgages and other liens to be granted to the Shipyards as to the Pacific Class Vessels and related assets in accordance with the terms of the Shipyards Agreement). Under the Modified Plan, on the Effective Date, all of the outstanding capital stock of Lykes Lines and any other Subsidiary shall be deemed cancelled. It is further

ORDERED, ADJUDGED AND DECREED that the Reorganized Debtor Common Stock to be issued and distributed to the Reorganized Debtor Stockholder pursuant to the Modified Plan shall be issued and distributed on the Effective Date free and clear of any and all Liens, Maritime Liens, Debts, obligations, encumbrances, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature whatsoever that arose or occurred prior to the Effective Date (except that this decretal paragraph shall not affect rights, if any, reserved in Articles 4.9 and 4.10 of the Modified Plan). It is further

ORDERED, ADJUDGED AND DECREED that pursuant to Section 1146(c) of the Bankruptcy Code, the making or delivery of an instrument or instruments of transfer, any or all of which include the revesting, transfer and/or the sale of any real or personal property or any direct or indirect interest therein, including, without limitation, (a) any transfers hereafter made in consummation of, or heretofore made in anticipation of the Confirmation and consummation of, the Modified Plan, and (b) all documents relating to or referred to in the Asset Purchase Agreement, the Plan Documents, the Shipyards Agreement, the Reorganized Debtor Term Sheet, the APL Letter Agreement and the PBGC/SEPP Agreement, shall not be taxed under any law imposing any recording, registration or stamp tax or fee, or any similar tax or fee, including any applicable transfer taxes or fees and mortgage recording taxes or fees. It is further

ORDERED, ADJUDGED AND DECREED that Joe B. Freeman, presently the Chief Executive Officer and President of the Debtor be, and hereby is, appointed as the Plan Distribution Trustee. It is further

ORDERED, ADJUDGED AND DECREED that, on the Effective Date, the Debtor and the Plan Distribution Trustee shall enter into the Plan Distribution Trust Agreement, which shall establish the Plan Distribution Trust in accordance with the terms of the Modified Plan and set forth the duties and compensation of the Plan Distribution Trustee. It is further

ORDERED, ADJUDGED AND DECREED that any and all funds in the Plan Distribution Trust (including the Plan Distribution Trust Assets) shall be held in an irrevocable trust for distribution as described in Article 8.1.1 of the Modified Plan. Such distributions shall be made in accordance with the rights and priorities set forth in Article 8.1.1 of the Modified Plan. The Plan Distribution Trustee is

authorized and directed to make immediate distributions to Creditors and to the Unsecured Creditors Trust and the Tort Claims Trust as described in the Modified Plan. The Plan Distribution Trustee is further authorized and directed to make an irrevocable cash distribution at the Closing to any Professional in the amount of such Professional's Administrative Claims as agreed to by the Plan Distribution Trustee and such Professional, subject to disgorgement of any amount so received by such Professional which is greater than the amount of such Professional's Allowed Administrative Claims. Once funds are deposited into the Plan Distribution Trust, they shall no longer be Property of the Debtor or any other Person or Entity and none of the Debtor, the Reorganized Debtor or any other Person or Entity shall have any claim to said funds. All funds in the Plan Distribution Trust (including the Plan Distribution Trust Assets) shall (a) be held in trust as set forth above, (b) not be Property of the Estate in this or any subsequent proceeding in which the Debtor or its successors or assigns may be a debtor under the Bankruptcy Code, and (c) be protected from, and not be subject to, the Claims of any Creditors of the Debtor (except as provided in the Modified Plan) or any creditor of Lykes Lines or the Reorganized Debtor. It is further

ORDERED, ADJUDGED AND DE-CREED that Joseph A. Pardo, Esquire be, and hereby is, appointed as the Unsecured Creditors Trustee. Each of Charles Sadoski, Patrick Morrissey and William Hamm are approved to serve as a member of the Oversight Committee. It is further

ORDERED, ADJUDGED AND DE-CREED that, on the Effective Date, the Debtor and the Unsecured Creditors Trustee shall execute the Unsecured Creditors Trust Agreement, which shall establish the Unsecured Creditors Trust in accordance with the terms of the Modified Plan and set forth the duties and compensation of the Unsecured Creditors Trustee. It is further

ORDERED, ADJUDGED AND DE-CREED that any and all funds in the Unsecured Creditors Trust (including the Unsecured Creditors Trust Assets) shall be held in an irrevocable trust for distribution to the Holders of Allowed Unsecured Claims in Class 16 as described in Article 8.2.3 of the Modified Plan. Such distributions shall be made in accordance with the procedures set forth in Article 8.2.3 of the Modified Plan. Once funds are deposited into the Unsecured Creditors Trust, they shall no longer be Property of the Debtor or any other Person or Entity and none of the Debtor, the Reorganized Debtor or any other Person or Entity shall have any claim to said funds. All funds in the Unsecured Creditors Trust (including the Unsecured Creditors Trust Assets) shall (a) be held in trust as set forth above, (b) not be Property of the Estate in this or any subsequent proceeding in which the Debtor or its successors or assigns may be a debtor under the Bankruptcy Code, and (c) be protected from, and not be subject to, the Claims of any Creditors of the Debtor (except as provided in the Modified Plan) or any creditor of Lykes Lines or the Reorganized Debtor. It is further

ORDERED, ADJUDGED AND DE-CREED that any payments or refunds, and all rights to and claims or causes of action for such payments or refunds, pursuant to or arising under the ODS Contract which are made on or after the Effective Date shall (a) be vested in the Plan Distribution Trustee with all of the rights and powers of the Debtor and the Debtor in Possession, (b) not be subject to setoff to any greater extent following the Effective Date than they were prior to the Effective Date, (c) be distributed in accordance with a mutually satisfactory agreement between the Plan Distribution Trustee and the Purchaser, (d) be held in trust by the Plan Distribution Trustee for the sole and exclusive benefit of the Purchaser until such payments or refunds have been distributed in accordance with such agreement; provided, however, that the Pur-

chaser may, in its discretion, and upon such terms and conditions as may be reasonably agreed to by the Purchaser and the Plan Distribution Trustee, consent to the Plan Distribution Trustee's use of such payments or refunds, upon the Plan Distribution Trustee's prior written request, for the sole and exclusive purpose of making distributions under Article 8.1 of the Modified Plan and repaying any loans under Article 8.1.7 of the Modified Plan, (e) not be Property of the Estate in this or any subsequent proceeding in which the Debtor or its successors or assigns may be a debtor under the Bankruptcy Code, and (f) be protected from, and not be subject to, the Claims of any Creditors of the Debtor or any creditor of Lykes Lines, the Reorganized Debtor or the Plan Distribution Trustee. It is further

ORDERED, ADJUDGED AND DECREED that on the Effective Date, any and all payments or refunds that are due and owing to the Debtor under the ODS Contract (other than ODS payments, if any, which specifically reimburse the Debtor for or on account of Class 13 Claims in accordance with Article 4.14 of the Modified Plan and this Confirmation Order) shall, subject to the provisions of Article 8.1.7 of the Modified Plan, vest in the Plan Distribution Trustee, in trust for the sole and exclusive benefit of the Purchaser, free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature (except for any Permitted Encumbrances). It is further

ORDERED, ADJUDGED AND DECREED that the Debtor and/or the Reorganized Debtor, as the case may be, and their directors, officers and agents are hereby authorized to enter into, execute, deliver, file and/or implement the Plan Documents and other documents and instruments substantially consistent therewith or incidental thereto and any amendments, supplements or modifications to such Plan Documents as may be appropriate, and to take such other steps and perform such other acts as may be necessary to implement and effectuate the Plan Documents, the Modified Plan, all other related instruments and documents and this Confirmation Order, and to satisfy other conditions precedent to the implementation and effectiveness of the Modified Plan. It is further

ORDERED, ADJUDGED AND DECREED that unless otherwise ordered by this Court, and except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with this Court on or before thirty (30) days following the Effective Date; provided, however, that the Unsecured Creditors Trustee shall file any objections to Unsecured Claims on or before ninety (90) days following his appointment pursuant to Article 8.2.1 of the Modified Plan (unless such period is extended by this Court upon motion of the Unsecured Creditors Trustee); and provided further that objections to Tort Claims may be filed at any time by the Tort Claims Trustee consistent with the Tort Claims Trust Agreement and the Tort Claims Resolution Procedures. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) thirty (30) days following the Effective Date or (b) the date sixty (60) days after the Debtor, the Plan Distribution Trustee, the Unsecured Creditors Trustee or other party in interest receives actual notice of the filing of such Claim. It is further

ORDERED, ADJUDGED AND DECREED that none of the Debtor, the Reorganized Debtor, the Plan Distribution Trustee or the Purchaser shall have any obligation to object to, or pay, Tort Claims or any Class 16 Unsecured Claims or pay any expenses of the Tort Claims Trust or the Unsecured Creditors Trust. It is further

ORDERED, ADJUDGED AND DECREED that, except for (a) the Secured

Class 8 and Class 9 Claims of the Shipyards under the Shipyards Agreement; (b) the Claims of the Union Plans as of the Effective Date as expressly set forth in Article 4.14 of the Modified Plan (limited exclusively to recourse against the proceeds of any recapture received under the ODS Contract specifically on account of or earmarked to pay Class 13 Claims in accordance with Article 4.14 of the Modified Plan and this Confirmation Order); and (c) the limited set-off right of the United States Internal Revenue Service (to receive the treatment solely as described in this Confirmation Order), the Debtor shall be discharged on the Effective Date from any and all Claims, Debts, Liens, encumbrances, contract rights, rights of setoff, or Liabilities of any nature (whether contingent, fixed, liquidated, unliquidated, matured, unmatured or disputed) that arose from any acts or conduct of the Debtor occurring prior to the Effective Date. It is further

ORDERED, ADJUDGED, AND DECREED that all rights of Holders of Claims or Equity Interests of all Classes under the Modified Plan, including, without limitation, the right to receive distributions on account of such Claims or Equity Interests, hereafter shall be limited solely to the right to receive such distributions exclusively according to the Modified Plan, the provisions of which shall be binding on such Holders to the fullest extent provided by Section 1141(a) of the Bankruptcy Code. After the date hereof, the Holders of such Claims or Equity Interests shall have no further rights against the Debtor or the Reorganized Debtor except as expressly provided in the Modified Plan. It is further

ORDERED, ADJUDGED AND DECREED that on the Effective Date, except as provided in Article 4.3.2 of the Modified Plan as to the SCSPA Secured Maritime Lien Claim, all Maritime Liens (other than the Secured Class 8 and Class 9 Claims of the Shipyards under the Shipyards Agreement) shall be automatically terminated

and discharged, and shall no longer be of any force and effect, against the Vessels (including the SUE LYKES and the Former Explorer Class Vessels), and any owner or operator (including the Debtor, the Reorganized Debtor and the Purchaser) of the Vessels (including the SUE LYKES and the Former Explorer Class Vessels) shall be released as to such Maritime Liens, in each case without any further action by any party. The treatment of, and the consideration to be received by, Maritime Lien Claimants pursuant to Article 4.12 of the Modified Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Maritime Liens. It is further

ORDERED, ADJUDGED, AND DECREED that the Modified Plan and its provisions shall be and hereby are binding upon the Debtor, the Debtor's Estate, the Reorganized Debtor, any Entity acquiring Property under the Modified Plan, all Creditors and all equity security holders of the Debtor, including all Future Claimants, whether or not the Claim or Equity Interest of such Creditors or equity security holders is impaired under the Modified Plan and whether or not such Creditors or equity security holders have accepted the Modified Plan, all creditors of Lykes Lines, all parties to the Acquired Contracts, all parties to any executory contract or unexpired lease of the Debtor that does not constitute an Acquired Contract, all other parties in interest, and the respective successors and assigns of each of the foregoing. It is further

ORDERED, ADJUDGED AND DECREED that except as otherwise expressly provided in the Modified Plan or in this Confirmation Order, as of the Effective Date, the following provisions relating to discharge, release, injunctions, and stays shall apply:

(a) any and all Debts of, Claims of any nature whatsoever against, and Equity Interests in, the Debtor that arose at any time prior to the Effective Date, including any and all Claims for

principal and interest, whether accrued before, on or after the Petition Date, and including all Underfunded Employee Benefit Plan Claims (except for the non-recourse liability to the extent provided in Article 4.14 of the Modified Plan and this Confirmation Order), shall be discharged, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law. Without limiting the generality of the foregoing, on the Effective Date, the Debtor and the Reorganized Debtor, and their respective successors or assigns, are hereby discharged from any Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (ii) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (iii) the Holder of a Claim based on such Debt has voted to accept the Plan or the Modified Plan;

(b) all Persons and Entities, including all Holders of a Claim or Equity Interest, including Future Claimants, are hereby forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtor, the Reorganized Debtor, the Reorganization Trusts, any Blue Water Entity, any CPL Entity, or any of their respective successors and assigns, or the assets or Properties of any of them (including the Acquired Assets and the Excluded Assets), any other or further Claims, Debts, Liens, rights, causes of action, remedies, Liabilities or Equity Interests based upon any act, omission, document, instrument, transaction or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementa-

tion of the Modified Plan. In accordance with the foregoing, except as specifically provided in the Modified Plan or this Confirmation Order, this Confirmation Order shall constitute a judicial determination of the discharge of all such Claims, Debts, Liens, rights, causes of action, remedies, Liabilities and Equity Interests against the Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor, at any time, to the extent that such judgment relates to a discharged Claim, Liability, Lien, right, cause of action, remedy, Debt or Equity Interest. Notwithstanding the foregoing, if under the Modified Plan any Reorganization Trust is obligated to make payments to Holders of Allowed Claims, such Reorganization Trust shall remain obligated to make such payments;

(c) subject to the provisions of this Confirmation Order pertaining to the preservation of the Causes of Action by the Unsecured Creditors Trustee and except as otherwise provided in the Modified Plan or this Confirmation Order, the Debtor, the Reorganized Debtor, their Affiliates, and their respective directors, officers, employees, agents, representatives, and Professionals (acting in such capacity), each of the CPL Entities, each of the Blue Water Entities, each of the Reorganization Trustees, the Legal Representative and his counsel, and the Unsecured Creditors' Committee and its Professionals (acting in such capacity), the Unofficial Asbestosis Committee and the Asbestos Claimants' Committee Counsel (acting in such capacity), and their respective heirs, executors, administrators, successors, and assigns, shall neither have nor incur any Liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good

faith in connection with or related to the formulation, preparation, dissemination, implementation, Confirmation, or consummation of the Modified Plan, the Disclosure Statement, the Amended and Restated Disclosure Statement, the Amended Summary Disclosure Statements, the Amended Summary Plan, the Confirmation Notice, any Plan Document, the Asset Purchase Agreement, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Modified Plan or this case. The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor, the Reorganized Debtor, the Legal Representative, the Reorganization Trustees, the Unsecured Creditors' Committee, the CPL Entities, the Blue Water Entities, the Unofficial Asbestosis Committee, and their respective agents and Professionals have or obtain pursuant to any provision of the Bankruptcy Code. This Court hereby determines that Article 11.2 of the Modified Plan is an integral part of the Modified Plan and is essential to its implementation;

(d) the Debtor, the Reorganized Debtor, the Unsecured Creditors' Committee, the Unofficial Asbestosis Committee, the Reorganization Trusts, the Reorganization Trustees, and any and all Holders of Claims and Equity Interests, including Future Claimants, shall release unconditionally, and are hereby deemed to release unconditionally (without any further action, document or notice), each of the CPL Entities from any and all Claims, Cure Claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, Debts, indebtedness, or Liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equi-

ty, admiralty or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, Lykes Lines, this case, the Acquired Assets, the Vessels, the Excluded Assets, any other assets or Property of the Debtor or Lykes Lines, the business or operations of the Debtor or Lykes Lines, the Reorganization Trusts, any Union Contracts, any Union Plans, any Employee Benefit Plan, the Asset Purchase Agreement, the Modified Plan, or any of the transactions contemplated thereby, including all Tort Claims, except as otherwise provided in the Modified Plan, the Plan Documents or this Confirmation Order. In addition, all Persons or Entities are hereby enjoined from prosecuting, whether directly, derivatively or otherwise, any such Claim, obligation, suit, judgment, damage, right, remedy, cause of action, charge, cost, Debt, indebtedness, or Liability which arose or accrued on or prior to the Effective Date or was or could have been asserted against any of the CPL Entities, except as otherwise provided in the Modified Plan, the Plan Documents or this Confirmation Order. Each of the CPL Entities shall have and is hereby granted the right to independently seek enforcement of this decretal paragraph and Article 11.3.1 of the Modified Plan. The Court hereby determines that Article 11.3.1 of the Modified Plan is an integral part of the Modified Plan and is essential to its implementation;

(e) the Debtor, the Reorganized Debtor, the Unsecured Creditors' Committee, the Unofficial Asbestosis Committee, the Reorganization Trusts, the Reorganization Trustees, and any and all Holders of Claims (other than the Shipyards as to the Blue Water Entities) and Equity Interests, including

Future Claimants, shall release unconditionally, and are hereby deemed to release unconditionally (without any further action, document, or notice), each of the Released Parties, except as otherwise provided in the Modified Plan, the Plan Documents or this Confirmation Order, from any and all Claims, Cure Claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs. Debts, indebtedness, or Liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, admiralty or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence (i) taking place between the Petition Date and the Effective Date or (ii) taking place before the Petition Date and in anticipation of the Debtor's Chapter 11 filing, which is in any way relating to the Debtor, Lykes Lines, this case, the Acquired Assets, the Vessels, the Excluded Assets, any other assets or Property of the Debtor or Lykes Lines, the business or operations of the Debtor or Lykes Lines, the Reorganization Trusts, any Union Contracts, any Union Plans, any Employee Benefit Plan, the Asset Purchase Agreement, the Modified Plan, or any of the transactions contemplated thereby, including all Tort Claims, but shall not include any such Claims or Causes of Action against any of the Released Parties arising out of the preparation and issuance of the Debtor's audited financial statements for the year ending December 31, 1994, and any amendments or modification thereof. All Persons or Entities are hereby enjoined from prosecuting, whether directly, derivatively or otherwise, any such Claim, obligation, suit, judgment, damage, right, remedy, cause of action, charge, cost, Debt, indebtedness, or Liability which arose or accrued during such periods or was or could have been asserted against any of the Released Parties, except as otherwise provided in the Modified Plan, the Plan Documents or this Confirmation Order. Each of the Released Parties shall have and is hereby granted the right to independently seek enforcement of this decretal paragraph and Article 11.3.2 of the Modified Plan (other than the Blue Water Entities as to the Shipyards). The Court hereby determines that Article 11.3.2 of the Modified Plan is an integral part of the Modified Plan and is essential to its implementation;

(f) pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Modified Plan, as of the date of the entry of this Confirmation Order, except as otherwise provided in the Modified Plan, the documents to be executed pursuant thereto, or in this Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Cure Claim or other Debt, Liability or Equity Interest are hereby and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such Claims, Cure Claims, Debts, Liabilities, or Equity Interests, other than actions brought to enforce any rights or obligations under the Modified Plan or the Plan Documents: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, the Reorganized Debtor, the Reorganization Trusts, any of the CPL Entities, or their respective Properties, including the Acquired Assets, the Vessels and the Excluded Assets; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Reorganized Debtor, the Reorganization Trusts, any of the

CPL Entities or their respective Properties, including the Acquired Assets, the Vessels and the Excluded Assets; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor, the Reorganization Trusts, any of the CPL Entities, or their respective Properties, including the Acquired Assets, the Vessels and the Excluded Assets; (iv) asserting a set-off, right of subrogation or recoupment of any kind against any Debt, Liability or obligation due to the Debtor, the Reorganized Debtor, the Reorganization Trusts, any of the CPL Entities or their respective Properties, including the Acquired Assets, the Vessels and the Excluded Assets; (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Modified Plan or this Confirmation Order; (vi) interfering with or in any manner whatsoever disturbing the rights and remedies of the Purchaser under the Asset Purchase Agreement and the documents executed in connection therewith, including the right of the Purchaser to possession of, good title to, and quiet enjoyment of the Acquired Assets; and (vii) without limiting the foregoing, commencing or continuing any Foreign Proceeding relating to or in connection with the Debtor, the Reorganized Debtor, the Reorganization Trusts, any of the CPL Entities, or their respective Properties, including the Acquired Assets, the Vessels and the Excluded Assets. The Debtor, the Reorganized Debtor, the Reorganization Trusts and each of the CPL Entities shall have and are hereby granted the right to independently seek enforcement of this decretal paragraph and Article 11.4 of the Modified Plan. The Court hereby determines that Article 11.4 of the Modified Plan is an integral part of the Modified Plan and is essential to its implementation;

(g) the Stay Order shall remain and continue in full force and effect after the date of entry of this Confirmation Order and shall permanently enjoin any and all foreign Creditors and foreign parties in interest from asserting, raising, prosecuting or continuing any Claims (including Separately Enforced Claims) or causes of action of any kind whatsoever in any domestic or Foreign Proceeding against any of the Released Parties, including any of the CPL Entities and the Reorganized Debtor, or the Property or assets of any of the Released Parties, including the Acquired Assets, the Vessels and the Excluded Assets, except that the Stay Order shall not apply to the enforcement of any rights and remedies under the Shipyards Agreement, including the documents attached thereto or referred to therein;

(h) all other injunctions or automatic stays provided for in this case pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the date of entry of this Confirmation Order, shall remain in full force and effect until the Effective Date, except that any such stay or injunction shall not apply to the enforcement of any rights and remedies under the Shipyards Agreement, including the documents attached thereto or referred to therein. Additionally, the Tort Claims Injunctions shall be and hereby are in full force and effect immediately upon the entry of this Confirmation Order and shall remain and continue in effect thereafter as provided for in this Confirmation Order;

(i) any preliminary or permanent injunction entered by this Court, including the Stay Order, shall continue in full force and effect following the date of entry of this Confirmation Order and

the Final Decree Date, unless otherwise ordered by this Court, and shall be enforced in any Foreign Proceeding, except that any such injunction shall not apply to the enforcement of any rights and remedies under the Shipyards Agreement, including the documents attached thereto or referred to therein;

(j) unless a taxing Governmental Authority has asserted a Claim against the Debtor before the Bar Date established therefor, no Claim of such Governmental Authority shall be Allowed against the Debtor for taxes, penalties, interest, additions to tax or other charges arising out of the failure, if any, of the Debtor, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or arising out of an audit of any return for a period before the Petition Date. The estimated Claim of the Internal Revenue Service shall be limited to the amount estimated and shall be enforced solely as set forth in this Confirmation Order;

(k) with the sole exception of the Assumed Obligations and any obligations under the Shipyards Agreement (including the documents attached thereto or referred to therein), the CPL Entities do not and shall not be deemed to, pursuant to the Modified Plan, the Asset Purchase Agreement, or otherwise, assume, agree to perform, pay or indemnify any Holders of any Claims or Equity Interests, including Future Claimants, or otherwise have any responsibilities for any Liabilities, Claims, Cure Claims, Debts or obligations (i) of the Debtor or the Reorganized Debtor relating to or arising out of the operations of or assets of the Debtor or the Reorganized Debtor, whether arising prior to, on or after the date of entry of this Confirmation Order or (ii) under, pursuant to or in connection with any Union Contracts, any Union Plans, any Employee Benefit Plan, the Salaried Pension Plan, any of the Insurance Policies, or any of the Protection and Indemnity Coverage, whether arising prior to, on or (with the sole exception of the Ship Management Company, if applicable) after the date of entry of this Confirmation Order. None of the CPL Entities is, shall be, or shall be deemed to be a successor or successor in interest to the Debtor by reason of any theory of law, admiralty or equity, and none shall have any successor or transferee liability of any kind or character, with the sole exception of the Assumed Obligations; and

(l) without limiting the foregoing, any and all Persons or Entities who have held, hold or may hold any Claim, Liability or obligation of any kind whatsoever, whether heretofore, now or hereafter arising, against any of the CPL Entities, and any of their respective agents, attorneys, and all others acting for or on their behalf, are, pursuant to Section 105(a) of the Bankruptcy Code, hereby permanently stayed, enjoined, restrained and prohibited on and after the Effective Date from:

i) commencing or continuing in any manner, directly or indirectly, any action or any other proceeding of any kind with respect to any Claim against any of the CPL Entities, or the property of any of the CPL Entities, including any of the Acquired Assets, premised upon the Purchaser or any other CPL Entity succeeding to the obligations or Liabilities of the Debtor;

ii) seeking the enforcement, attachment, collection or recovery by any manner or means, whether directly or indirectly, of any judgment, award, decree or order against any of the CPL Entities or the Property or assets of any of the CPL Enti-

ties, including any of the Acquired Assets, premised upon the Purchaser or any other CPL Entity succeeding to the obligations or Liabilities of the Debtor;

iii) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against any of the CPL Entities or the Property or assets of any the CPL Entities, including any of the Acquired Assets, which Lien or encumbrance is premised upon the Purchaser or any other CPL Entity succeeding to the obligations or Liabilities of the Debtor;

iv) asserting any set-off, right of subrogation, indemnity, contribution, or recoupment or any claim over of any kind, directly or indirectly, against any obligation due to any of the CPL Entities which is premised upon the Purchaser or any other CPL Entity succeeding to the obligations or Liabilities of the Debtor;

v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with the provisions of the Modified Plan, this Confirmation Order or the Asset Purchase Agreement; and

vi) commencing or continuing in any manner, directly or indirectly, any action or any other proceeding of any kind against any of the CPL Entities (with the sole exception of the Ship Management Company, if applicable), or the Property or assets of any of the CPL Entities (with the sole exception of the Ship Management Company, if applicable), including the Acquired Assets, or seeking the enforcement, attachment, collection or recovery by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against any of the CPL Entities (with the sole exception of the Ship Management Company, if applicable) or the

Property or assets of the CPL Entities (with the sole exception of the Ship Management Company, if applicable), including the Acquired Assets, based upon, arising under, or relating to any Union Contracts, any Union Plans, any Employee Benefit Plan, or the Salaried Pension Plan, or any of the federal or state laws, statutes, decisions or regulations relating thereto.

This decretal paragraph shall not affect the enforcement of any rights and remedies under the Shipyards Agreement (including the documents attached thereto or referred to therein). Each of the CPL Entities shall have and is hereby granted the right to independently seek enforcement of this decretal paragraph and Article 11.7 of the Modified Plan. The Court hereby determines that Article 11.7 of the Modified Plan is an integral part of the Modified Plan and is essential to its implementation.

It is further

ORDERED, ADJUDGED AND DECREED that pursuant to the Modified Plan, the entry of this Confirmation Order shall constitute the irrevocable conveyance to the Unsecured Creditors Trust of all of the Causes of Action for the benefit of all beneficiaries of the Unsecured Creditors Trust. It is further

ORDERED, ADJUDGED AND DECREED that, notwithstanding the terms of any other provision of the Modified Plan or this Confirmation Order to the contrary, the Unsecured Creditors Trust shall retain all Claims and Causes of Action against all Creditors and third parties held by the Debtor or the Holder of any Claim or Equity Interest (except those which constitute Acquired Assets and are acquired by the Purchaser), except to the extent a Creditor or other third party has been specifically released from any Claims or Causes of Action which the Estate may have by the terms of the Modified Plan or by another order of this Court. Moreover,

neither a vote to accept the Plan or Modified Plan by any Creditor nor the entry of this Confirmation Order will result in the waiver or release of any of the Estate's Claims or Causes of Action against such Creditor. Confirmation of the Modified Plan and entry of this Confirmation Order is not intended to and shall not be deemed to have any *res judicata* or other effect which would preclude or inhibit prosecution of such Claims following Confirmation of the Modified Plan. It is further

ORDERED, ADJUDGED AND DE-CREED that fifty percent (50%) of any Causes of Action Recoveries shall be held for the benefit of, and paid to, the Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Class 1 Claims, and valid Prepetition Maritime Liens against the Oceanus Class Vessels to the extent of the unpaid portion of their Allowed Claims. Notwithstanding any provision in the Modified Plan to the contrary (including Article 8.2.5.4), the Holders of Allowed Class 2A and Class 3 Claims shall not be entitled to receive any Causes of Action Recoveries. It is further

ORDERED, ADJUDGED AND DE-CREED that the Causes of Action shall include, but are not limited to, the following claims and types of claims whether held by the Debtor or the Holders of Claims and Equity Interests against:

(a) Lykes Bros. Inc. and its Affiliates and subsidiaries, including, without limitation, Lykes Services, Inc. and Lykes Insurance, Inc., and their respective officers and directors, including, in particular, the officers and directors of such companies who also served as officers or directors of the Debtor, with respect to the operation and management of the Debtor, including breach of fiduciary duty, negligence, fraud, misrepresentation, corporate advantage, breach of contract and federal and state statutory claims; and transfers by the Debtor to any of such enti-

ties, including preferential transfers and fraudulent conveyances;

(b) Price Waterhouse LLP, with respect to potential claims arising out of the issuance of the Debtor's audited financial statements for the year ending December 31, 1994 and other Prepetition services;

(c) Each of the recipients of transfers listed on the Debtor's list of payments in excess of $100,000 each made to Creditors and insiders referenced in the Amended and Restated Disclosure Statement, to the extent that any such transfers constitute preferential transfers or fraudulent conveyances of the Debtor's Property; and

(d) Any Creditor who during the course of .this case increased, directly or indirectly, the amount of its Postpetition charges to or collections from the Debtor in order to collect amounts due to such Creditor on account of its Prepetition Claim.

It is further

ORDERED, ADJUDGED AND DE-CREED that on the Effective Date, the Debtor and the Tort Claims Trustee are hereby directed to enter into the Tort Claims Trust Agreement, which shall comply with the terms of the Modified Plan and be in a form approved by this Court. The Tort Claims Trust Agreement will establish the Tort Claims Trust which shall be a distinct legal entity from the Debtor, the Reorganized Debtor, the Plan Distribution Trust, the Unsecured Creditors Trust, the Blue Water Entities, and the CPL Entities, each of which shall have no liability whatsoever for any obligations of the Tort Claims Trust pursuant to the Modified Plan, the Tort Claims Trust Agreement or otherwise. On the Effective Date, pursuant to the Tort Claims Trust Agreement, the Debtor shall designate and appoint the Tort Claims Trust and the Tort Claims Trustee as its agent in respect of the Insurance Policies and the Protection and Indemnity Coverage (to the ex-

tent such Insurance Policies and such Protection and Indemnity Coverage relate to Tort Claims), subject to the terms and conditions contained in Article 9 of the Modified Plan, the Tort Claims Trust Agreement, and the Asset Purchase Agreement. The Tort Claims Trustee shall have the power and ability to file such motions or proceedings with this Court as could be filed by the Debtor prior to the Confirmation of the Modified Plan relating to such Insurance Policies and the Protection and Indemnity Coverage (to the extent such Insurance Policies and such Protection and Indemnity Coverage relate to Tort Claims). It is further

ORDERED, ADJUDGED AND DECREED that, on the Effective Date, the Tort Claims Trust Assets, including but not limited to the Tort Claims Trust Deposit, shall be, automatically and without further act or deed, transferred to, vested in and assumed by the Tort Claims Trust. However, to the extent certain Tort Claims Trust Assets relating to the Insurance Coverage and the Protection and Indemnity Coverage, which because of their nature may accrue or become available following the Effective Date, cannot be transferred to, vested in and assumed by the Tort Claims Trust on the Effective Date, such Tort Claims Trust Assets shall be, automatically and without further act or deed, transferred to, vested in and assumed by the Tort Claims Trust as soon as practicable following the Effective Date. It is further

ORDERED, ADJUDGED AND DECREED that except as otherwise expressly provided in the Modified Plan, the transfer to, vesting in and assumption by the Tort Claims Trust of the Tort Claims Trust Assets, as contemplated in the Modified Plan and the Tort Claims Trust Agreement, shall, as of the date of entry of this Confirmation Order, discharge, release and extinguish all obligations and Liabilities of the Released Parties and the Protected Parties for and in respect of all Tort Claims. The Tort Claims Trust shall

assume sole responsibility and liability for all Tort Claims and such Tort Claims shall be paid solely from the Tort Claims Trust Assets or by exercise of the Tort Claims Trustee's rights as agent of the Debtor in accordance with the terms of the Modified Plan, the Tort Claims Trust Agreement, and the Tort Claims Resolution Procedures. It is further

ORDERED, ADJUDGED AND DECREED that on the Effective Date, all Tort Claims shall be and hereby are channeled to the Tort Claims Trust (with the sole exception of those Tort Claims which (a) are Eligible Class 16 Claims or (b) are not Insured Claims). In this regard, it is hereby ordered, pursuant to Sections 105(a), 1123 and 1141(a) of the Bankruptcy Code, that:

(a) all Tort Claims (other than (a) Eligible Class 16 Claims or (b) Tort Claims which are not Insured Claims) shall channel, transfer and attach solely and exclusively to the Tort Claims Trust Assets;

(b) the sole and exclusive right and remedy available to Tort Claimants (other than (a) Eligible Class 16 Claims or (b) Tort Claims which are not Insured Claims) shall be the entitlement, in accordance with the Tort Claims Trust Agreement, to assert Tort Claims solely and exclusively against the Tort Claims Trust, and such Tort Claims shall be channeled, transferred and attached solely and exclusively to the Tort Claims Trust Assets;

(c) all Persons or Entities which have held or asserted, which hold or assert or which may in the future hold or assert, any Claim or demand which constitutes a Tort Claim are hereby and shall be, permanently stayed, enjoined, restrained and prohibited from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery in respect of any such Tort Claim, including:

i) commencing, conducting or continuing in any manner any suit, action or Claim or any proceeding of any kind (including any thereof in a judicial, arbitral, administrative or other forum, within or without the United States) with respect to any Lien. Claim, interest, and/or Liability against or affecting any Released Party or Settling Insurers (except, solely with respect to the Settling Insurers, as described in the Tort Claims Resolution Procedures), or against such Released Party's or Settling Insurers' (except, solely with respect to the Settling Insurers, as described in the Tort Claims Resolution Procedures) assets or Property or any portion thereof, including any of the Acquired Assets, the Vessels, and the Excluded Assets;

ii) the enforcement, attachment, collection, levy or recovery by any manner or means, whether directly or indirectly, of any Lien, judgment, award, decree, or order against any Released Party or its Property or its assets or any portion thereof, including the Acquired Assets, the Vessels, and the Excluded Assets, with respect to any Liens, Claims, interests and/or Liabilities;

iii) the creation, perfection or enforcement in any manner, directly or indirectly, of any Lien of any kind against any Released Party, its assets or its Property or any portion thereof with respect to any such Liens, Claims, Liabilities, and/or interests; and

iv) any act, in any manner, in any place whatsoever, which does not conform to, or comply with, the provisions of the Modified Plan, the Plan Documents, including the Tort Claims Trust Agreement, the Tort Claims Resolution Proce-

dures, and this Confirmation Order.

It is further

ORDERED, ADJUDGED AND DECREED that the injunction contained in the preceding decretal paragraph constitutes a "Tort Claim Injunction" (as defined in the Modified Plan) and shall be and hereby is construed in the broadest scope possible and shall channel any and all such foregoing Liens, Claims, interests, and/or Liabilities to the Tort Claims Trust Assets under the Tort Claims Trust Agreement and shall render any Released Party or Settling Insurers (except, solely with respect to the Settling Insurers, as described in the Tort Claims Resolution Procedures) immune from and against any and all such Liens. Claims, interests, and/or Liabilities. Each of the Released Parties or Settling Insurers (except, solely with respect to the Settling Insurers, as described in the Tort Claims Resolution Procedures) shall have the right to independently seek enforcement of this Tort Claims Injunction. The Court hereby determines that this Tort Claims Injunction is an integral part of the Modified Plan and is essential to its implementation. It is further

ORDERED, ADJUDGED AND DECREED that, pursuant to Sections 105(a), 1123 and 1141(a) of the Bankruptcy Code, all Persons or Entities which have held or asserted, which hold or assert or which may in the future hold or assert, any Claim or demand against any of the Protected Parties based upon, relating to, arising out of, or in any way connected with any Tort Claim (a "Third Party Claim") are hereby permanently stayed, enjoined, restrained and prohibited from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such Third Party Claim, including:

(a) commencing, conducting or continuing in any manner any suit, action or Claim or any proceeding of any kind (including any thereof in a judicial,

arbitral, administrative or other forum, within or without the United States) with respect to any such Third Party Claim against or affecting any Protected Party or Settling Insurers (except, solely with respect to the Settling Insurers, as described in the Tort Claims Resolution Procedures), or against such Protected Party's or Settling Insurers' (except, solely with respect to the Settling Insurers, as described in the Tort Claims Resolution Procedures) assets or Property or any portion thereof, including any of the Acquired Assets, the Vessels and the Excluded Assets, for or on account of any Third Party Claim arising in any way from ownership or operation of the business of the Debtor or of its Property, prior to the date of entry of this Confirmation Order;

(b) the enforcement, attachment, collection, levy or recovery by any manner or means, whether directly or indirectly, of any Lien, judgment, award, decree, or order against any Protected Party or its Property or its assets or any portion thereof, including any of the Acquired Assets, the Vessels and the Excluded Assets, with respect to any such Third Party Claim;

(c) the creation, perfection or enforcement in any manner, directly or indirectly, of any Lien of any kind against any Protected Party, its Property or its assets or any portion thereof, including any of the Acquired Assets, the Vessels and the Excluded Assets, with respect to any such Third Party Claim;

(d) commencing, conducting or continuing any action or other proceeding of any kind or enforcing, attaching, collecting, or recovering, by any manner or means (including any thereof in a judicial, arbitral, administrative or other forum, within or without the United States), any judgment, award, decree, or order, with respect to any such Third Party Claim against any Protected Party that, pursuant to the Modified Plan or after the date of entry of this Confirmation Order, makes a loan to any of the Released Parties, or creating, perfecting, enforcing, attaching, recovering, upsetting or impairing any Lien made in connection with such loan by reason of any such Third Party Claim;

(e) except as otherwise specifically provided in the Modified Plan, the assertion of or accomplishment of any setoff, right of subrogation or contribution or recoupment of any kind against any obligation due any Protected Party or against the Property or assets of any Protected Party, including any of the Acquired Assets, the Vessels and the Excluded Assets, with respect to any such Third Party Claim; and

(f) any act, in any manner, in any place whatsoever, which does not conform to, or comply with, the provisions of the Modified Plan, the Plan Documents, including the Tort Claims Trust Agreement, the Tort Claims Resolution Procedures, or this Confirmation Order relating to such Third Party Claim.

It is further

ORDERED, ADJUDGED AND DECREED that the injunction contained in the preceding decretal paragraph (also, a "Tort Claims Injunction" as defined in the Modified Plan) shall be construed in the broadest scope possible and shall channel any and all such foregoing Liens, Claims (including Third Party Claims), Liabilities, and/or interests to the Tort Claims Trust Assets under the Tort Claims Trust Agreement and shall render any Protected Party or Settling Insurers (except, solely with respect to the Settling Insurers, as described in the Tort Claims Resolution Procedures) immune from and against any and all such Liens, Claims (including Third

Party Claims), Liabilities, and/or interests. Each of the Protected Parties or Settling Insurers (except, solely with respect to the Settling Insurers, as described in the Tort Claims Resolution Procedures) shall have the right to independently seek enforcement of this Tort Claims Injunction. The Court hereby determines that this Tort Claims Injunction is an integral part of the Modified Plan and is essential to its implementation. It is further

ORDERED, ADJUDGED AND DECREED that notwithstanding anything to the contrary in this Confirmation Order or the Modified Plan, the Tort Claims Injunctions provided for herein and therein shall not impair:

(a) the rights of Persons or Entities with Tort Claims which are Insured Claims to assert such Tort Claims solely and exclusively against the Tort Claims Trust Assets in accordance with the Tort Claims Trust Agreement and the Tort Claims Resolution Procedures;

(b) the rights of Persons or Entities to assert any Claim, Debt, obligation or Liability for payment of Tort Claims Trust Expenses solely and exclusively against the Tort Claims Trust Assets; and

(c) the rights of the Tort Claims Trust or the Reorganized Debtor to prosecute any Insurance Action.

It is further

ORDERED, ADJUDGED AND DECREED that the entry of this Confirmation Order acts and shall be deemed to act as a full and complete discharge of all Liens, Claims, Debts, Liabilities, and/or interests arising from, relating to or in connection with Tort Claims, including all Deductible Claims, except to the extent that the Tort Claims Trust Agreement and Tort Claims Resolution Procedures pro-

vide a mechanism for payment thereof and except as otherwise set forth in the Asset Purchase Agreement as to the payment of certain Postpetition deductible amounts. It is further

ORDERED, ADJUDGED AND DECREED that the discharge and release of the Debtor and its successors and assigns shall neither diminish nor impair the enforceability of any of the Insurance Coverage and the Protection and Indemnity Coverage by the Tort Claims Trust. The Tort Claims Trust is, and shall be deemed to be, the Debtor's duly authorized agent or receiver [10] for purposes of dealing with the Insurance Companies and any Club on the Debtor's behalf. It is further

ORDERED, ADJUDGED AND DECREED that this Court reserves continuing jurisdiction to enforce the provisions of Article 9 of the Modified Plan and the provisions of this Confirmation Order relating to Tort Claims, including the entry of contempt orders for any willful violation of same. It is further

ORDERED, ADJUDGED AND DECREED that the entry of this Confirmation Order will not be a consent to or waiver of jurisdiction by any Tort Claimant, any Insurance Company, or any Club, except as expressly provided for otherwise in the Modified Plan, this Confirmation Order, the Tort Claims Trust Agreement, or the Tort Claims Resolution Procedures. It is further

ORDERED, ADJUDGED AND DECREED that the Tort Claims Trustee shall have the authority to arrange cash financing in respect of the payment of Tort Claims, including as to the Rickmers Claim. This authority shall include the right to obtain a line of credit type financing. The terms and conditions of any such financing shall be the subject of a separate agreement between the Tort Claims Trust-

---

10. To the extent this Confirmation Order refers to the Tort Claims Trust or the Tort Claims Trustee as acting as the Debtor's or Reorganized Debtor's duly authorized agent or receiver, the Tort Claims Trustee will act on behalf of and by and through the Tort Claims Trust to so exercise the powers and rights of the Debtor and the Reorganized Debtor consistent with the meaning and intent of Article 9 of the Modified Plan.

ee and the Person or Entity involved. It is further

ORDERED, ADJUDGED AND DECREED that nothing in this Confirmation Order, the Amended and Restated Disclosure Statement, the Modified Plan and/or any other instrument or agreement, notwithstanding anything to the contrary therein, shall be construed to be or deemed to be in any manner an alteration, modification, variance, amendment, waiver or any other type of change to the terms and conditions of the applicable Rules and terms and conditions of coverage by MOAC, the UK P & I Club and Steamship Mutual applicable to the Debtor and/or any agent acting on behalf of the Debtor. It is further

ORDERED, ADJUDGED, AND DECREED that, in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy Code, and subject further to the terms and conditions of the Asset Purchase Agreement, the Assumption Agreement and the Executory Contract Order, on the Closing Date, the Debtor is hereby authorized and directed to and shall:

(a) assign to the Purchaser, and the Purchaser is hereby authorized and directed to and shall assume any Assumed Obligations under, each Postpetition Contract and each Prepetition Assumed Contract, free and clear of any and all Claims, Cure Claims, Liens, Debts, obligations, Liabilities and all other interests of every kind and nature; and

(b) assume and assign to the Purchaser, and the Purchaser is hereby authorized and directed to and shall assume any Assumed Obligations under, each Selected Contract and each Lykes Lines Contract, free and clear of any and all Claims, Cure Claims, Liens, Debts, obligations, Liabilities and all other interests of every kind and nature.

It is further

ORDERED, ADJUDGED AND DECREED that this Confirmation Order constitutes an order of this Court approving and authorizing the assumption by the Debtor and/or the assignment by the Debtor to the Purchaser of each of the Acquired Contracts (including the Lykes Lines Contracts) pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, as of the Effective Date. It is further

ORDERED, ADJUDGED AND DECREED that, pursuant to the Executory Contract Order, any lessor or other party to any Acquired Contract (including any Lykes Lines Contract) which did not file with this Court and serve, on or before February 14, 1997, (a) a written objection to the proposed assumption by the Debtor and/or assignment to the Purchaser of its Acquired Contract in the manner set forth in the Executory Contract Procedural Order is hereby conclusively deemed (i) to have waived any such objection and (ii) to have consented to the assumption by the Debtor and/or assignment to the Purchaser of its Acquired Contract pursuant to the terms and conditions of the Asset Purchase Agreement, and is hereby permanently barred and restrained from objecting to the assumption by the Debtor and/or assignment to the Purchaser of its Acquired Contract, and (b) a Cure Claim, default or other Claim in the manner set forth in the Executory Contract Procedural Order is hereby conclusively deemed to have acknowledged that no default or Claim (including any Cure Claim) exists under any such Acquired Contract through the Effective Date and is hereby permanently barred and restrained from asserting or alleging any default or Claim (including any Cure Claim) against the Debtor, the Purchaser or any other CPL Entity, based upon actions, omissions or events occurring on or before the Effective Date in connection with or under any such Acquired Contract. It is further

ORDERED, ADJUDGED AND DECREED that, with respect to each Acquired Contract assumed by the Debtor and/or assigned by the Debtor to the Pur-

chaser under the Modified Plan, this Confirmation Order, the Executory Contract Order, or any other order of this Court, the Debtor has (a) paid and performed in full any and all Cure Claims under such Acquired Contract as of the Effective Date, (b) provided adequate assurance of future performance under such Acquired Contract, and (c) otherwise complied with and satisfied the terms and conditions of Sections 365 and 1123(b)(2) of the Bankruptcy Code with respect to such Acquired Contract. The assignment to the Purchaser of each of the Acquired Contracts shall be, and shall be deemed to be, free and clear of any and all Cure Claims, any right to adequate assurance or any right to compensation to which any party may be entitled in connection with any Acquired Contract pursuant to Section 365 of the Bankruptcy Code, and any Prepetition or Postpetition Claims, damages, Debts, or Liabilities arising from or relating to any Acquired Contract or the assumption and/or assignment thereof, except as otherwise provided in the Assumption Agreement. It is further

ORDERED, ADJUDGED AND DECREED that the assumption by the Debtor and the assignment by the Debtor to the Purchaser of the Selected Contracts and the Lykes Lines Contracts and the assignment by the Debtor to the Purchaser of the Prepetition Assumed Contracts and the Postpetition Contracts is hereby deemed to be and shall be binding upon any and all parties to such Selected Contracts, Prepetition Assumed Contracts, Postpetition Contracts and Lykes Lines Contracts as a matter of law, notwithstanding any provision in any Acquired Contract prohibiting or restricting the assignment of such Acquired Contract. It is further

ORDERED, ADJUDGED AND DECREED that neither the Debtor nor the Purchaser shall be required to obtain the consent or acknowledgment of any party to any Acquired Contract to effectuate the assignment of any Acquired Contract to the Purchaser. It is further

ORDERED, ADJUDGED AND DECREED that the ODS Contract and the MSP Contracts shall be treated in the manner set forth in the MarAd Order. It is further

ORDERED, ADJUDGED, AND DECREED that, subject to the requirements of Section 365 of the Bankruptcy Code and subject to terms and conditions satisfactory to the Blue Water Entities and the Purchaser in their discretion, on the Effective Date, the Debtor shall assume and assign all of the Union Contracts (as modified) to the Ship Management Company, which shall assume sponsorship of the Union Plans on the Effective Date; provided, however, that on and after the Effective Date the Ship Management Company shall be the sole entity bound by or subject to any of the obligations, liabilities, responsibilities, terms, conditions and provisions of, under or relating to any Union Contracts and any Union Plans; and provided further that, with the sole exception of the Ship Management Company, none of the CPL Entities or the Blue Water Entities shall be bound by or subject to, or shall have any obligations, responsibilities or liabilities whatsoever under, relating to or in connection with, any Union Contracts and Union Plans, or any of the federal or state laws, statutes, decisions or regulations relating thereto, including, without limitation, any obligation to make any contributions to any Union Plans. Subject to the requirements of Section 365 of the Bankruptcy Code, on the Effective Date, the Debtor shall assume all of the Insurance Policies and Protection and Indemnity Coverage with the Insurance Companies and the Clubs, respectively. Nothing contained in the Modified Plan or in this Confirmation Order shall limit the right of the Debtor or the Tort Claims Trustee and the Tort Claims Trust in their capacity as agent for the Debtor to seek to assign such Insurance Policies and Protection and Indemnity Coverage to the Tort Claims

Trust, subject to any and all reservations of rights, defenses and claims of the Insurance Companies and the Clubs. In addition, subject to terms and conditions satisfactory to the Blue Water Entities and the Purchaser in their discretion, on the Effective Date, the Ship Management Company shall adopt the Salaried Pension Plan in accordance with the terms and conditions of the PBGC/SEPP Agreement; provided that the PBGC/SEPP Agreement shall govern the rights and obligations of the parties to the PBGC/SEPP Agreement with respect to the Salaried Pension Plan; provided, however, that, subject to the PBGC/SEPP Agreement, on and after the Effective Date the Ship Management Company shall be the sole entity bound by or subject to any of the obligations, liabilities, responsibilities, terms, conditions and provisions of, under or relating to the Salaried Pension Plan; and provided further that, with the sole exception of the Ship Management Company, none of the CPL Entities (except the Purchaser solely to the extent of its limited contingent obligation as set forth in Section 2 of the PBGC/SEPP Agreement to make certain minimum funding contributions in the maximum aggregate amount of $100.000 in the event such contributions are not made by the Ship Management Company) or the Blue Water Entities shall be bound by or subject to, or shall have any obligations, responsibilities or liabilities whatsoever under, relating to or in connection with, the Salaried Pension Plan, or any of the federal or state laws, statutes, decisions or regulations relating thereto. It is further

ORDERED, ADJUDGED AND DECREED that any unexpired lease or executory contract that has not been expressly assumed by the Debtor with this Court's approval on or prior to the date of entry of this Confirmation Order shall, as of the date hereof (subject to the occurrence of the Effective Date), be deemed to have been rejected by the Debtor unless there is pending before this Court on the date of entry of this Confirmation Order a motion to assume such unexpired lease or executory contract or to extend the date to assume such unexpired lease or executory contract. This Confirmation Order shall constitute an order of this Court approving and authorizing the rejection of each such lease and contract, pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, as of the Effective Date. Specifically, and without limiting the scope of this decretal paragraph, and except as otherwise expressly provided with respect to Class 13, the Debtor is hereby deemed to reject any contract or agreement (written or otherwise) that would impose any liability on the Reorganized Debtor or any Released Party on account of an Underfunded Employee Benefit Plan Claim. It is further

ORDERED, ADJUDGED AND DECREED that any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with this Court on or before the Bar Date for rejection damage Claims set forth in the Bar Date Order and served upon the Debtor and/or the Unsecured Creditors Trustee (as the case may be) or such Claim shall be forever barred and unenforceable against the Debtor, the Reorganized Debtor, any Reorganization Trust, or any CPL Entity. Such Claims once fixed and liquidated by this Court and determined to be Allowed Claims shall be Class 16 Allowed Claims. Any such Claims that become Disputed Claims shall be Class 16 Disputed Claims for purposes of administration of the Unsecured Creditors Trust. The Modified Plan and the Bar Date Order are hereby deemed to constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith. It is further

ORDERED, ADJUDGED, AND DECREED that on the Effective Date, in accordance with the terms of the PBGC/SEPP Agreement, any and all Claims, causes of action, Liens, security interests,

interests, and other encumbrances that the PBGC had, has or may have, if any, whether contingent or otherwise, asserted or unasserted, known or unknown, against the Debtor, the Reorganized Debtor, the Reorganized Debtor Stockholder, any of the Blue Water Entities, any of the CPL Entities, the Acquired Assets, the Vessels, the Lykes Lines Assets (including the Lykes Lines Contracts), or any of the other assets or Property of any of the foregoing entities, shall be and hereby are fully and unconditionally discharged, released and barred forever, with the sole exception of the limited remedy in favor of the PBGC against any residual interest of the Reorganized Debtor in the Pacific Class Vessels as provided in Section 5 of the PBGC/SEPP Agreement. On the Effective Date, any and all Claims, causes of action, Liens, security interests, interests and other encumbrances that any of the NYSA–ILA Entities had, has or may have, if any, whether contingent or otherwise, asserted or unasserted, known or unknown, against the Debtor, the Reorganized Debtor, the Reorganized Debtor Stockholder, any of the Blue Water Entities, any of the CPL Entities, the Acquired Assets, the Vessels, the Lykes Lines Assets (including the Lykes Lines Contracts), or any of the other assets or Property of any of the foregoing entities, shall be and hereby are fully and unconditionally discharged, released and barred forever. It is further

ORDERED, ADJUDGED AND DECREED that all of the creditors of Lykes Lines shall be, and are hereby directed to be, treated as Prepetition Unsecured Creditors of the Debtor, and all liabilities of Lykes Lines shall be and hereby are deemed to be Prepetition Unsecured Claims of the Debtor. None of the creditors of Lykes Lines shall have any recourse whatsoever against the Reorganized Debtor, the Debtor, the Blue Water Entities, the Purchaser or any of the CPL Entities or any of their respective successors, assigns or Properties. It is further

ORDERED, ADJUDGED, AND DECREED that pursuant to a separate order of this Court granting the Motion to Compromise with Lykes Lines, the Debtor is and shall be hereby authorized to foreclose upon, and receive the transfer or assignment of title to, the Lykes Lines Assets, including the Lykes Lines Contracts, pursuant to the terms of the Motion to Compromise with Lykes Lines, the Modified Plan and this Confirmation Order. The Debtor's foreclosure upon, and receipt of the transfer or assignment of, the Lykes Lines Assets, including the Lykes Lines Contracts, is and shall be deemed to be valid, fully enforceable and proper under applicable law and complies in all respects with the requirements of Section 9–504 of the Florida Uniform Commercial Code and otherwise applicable law. Pursuant to Section 9–504 of the Florida Uniform Commercial Code and otherwise applicable law, and in accordance with the PBGC/SEPP Agreement, the Debtor's foreclosure upon, and receipt of the transfer or assignment of, the Lykes Lines Assets, including the Lykes Lines Contracts, is and shall be deemed to be free and clear of any and all Claims, causes of action, Liens, security interests, interests and other encumbrances of any and all creditors, contingent or otherwise, of Lykes Lines, including without limitation the PBGC and each of the NYSA–ILA Entities, and any other interested party or entity, subject only to (i) the pre-confirmation Claims or Liens of the PBGC, if any, against Lykes Lines, which Claims and Liens the PBGC has agreed to, and is hereby directed and ordered to, compromise, waive and release as of the Effective Date, and (ii) the Assumed Obligations. It is further

ORDERED, ADJUDGED, AND DECREED that the Debtor's foreclosure upon, and receipt of the transfer or assignment of, the Lykes Lines Assets, including the Lykes Lines Contracts, is and shall be deemed to be for reasonably equivalent value and fair consideration as a matter of law, and is not and shall not be deemed to

be avoidable under any avoidance or similar cause of action, claim, or remedy under the Bankruptcy Code or otherwise applicable non-bankruptcy law, including without limitation any fraudulent conveyance or fraudulent transfer cause of action, claim or remedy under Section 544 or 548 of the Bankruptcy Code or under otherwise applicable state law. It is further

ORDERED, ADJUDGED, AND DE-CREED that based on the facts adduced at the Confirmation Hearing, the Affidavit of Jeanette Bradley, and the record in this case, the Debtor has satisfied and complied with the requirements of Section 1129(a)(13) of the Bankruptcy Code as a matter of law. The Court concludes that, under the facts and circumstances of this case, (i) the Debtor properly, unconditionally, and completely terminated any obligation it had or may have had to provide any "retiree benefits" (as such term is defined in Section 1114 of the Bankruptcy Code) prior to the date of this Confirmation Order, and (ii) neither the Debtor, the Reorganized Debtor, nor any other entity is or shall be obligated to provide any "retiree benefits" (as such term is defined in Section 1114 of the Bankruptcy Code) upon or after the Effective Date. It is further

ORDERED, ADJUDGED, AND DE-CREED that any provisions of the Debtor's collective bargaining agreement with or relating to MEBA, or any of the Debtor's other collective bargaining agreements, requiring that the Debtor obtain from a purchaser or transferee an agreement with respect to employment or terms and conditions of employment are not, and shall not be deemed to be, applicable to the transactions and other matters contemplated by the Asset Purchase Agreement, the Modified Plan or the Plan Documents. It is further

ORDERED, ADJUDGED, AND DE-CREED that the Debtor's compromise and settlement with the Blue Water Entities under the Modified Plan is hereby approved and the parties are authorized and directed to perform according to its terms. The parties have informed the Court that the Blue Water Appeal has been dismissed as a result of the agreement set forth in the Reorganized Debtor Term Sheet, with leave to renew for 90 days, which right the Blue Water Entities waive as of the Effective Date. In light of the foregoing, and the compromise and settlement contained in the Modified Plan, the Blue Water Order is hereby vacated as of the Effective Date. It is further

ORDERED, ADJUDGED, AND DE-CREED that nothing in the compromise and settlement of the Blue Water Appeal shall constitute an admission or determination for any purpose (such as for tax issues) other than as expressly set forth in the Modified Plan. It is further.

ORDERED, ADJUDGED AND DE-CREED that the Class 8 Claims of Mitsui and the Class 9 Claims of Mitsubishi shall be treated in accordance with the terms of the Shipyards Agreement, which Shipyards Agreement and the documents attached thereto or referred to therein shall be incorporated in the Modified Plan and in this Confirmation Order by this reference thereto; provided, however, that, subject to the "Reduction Conditions" (as defined below), the original principal balance of each of the amended and restated promissory notes to be executed on the Effective Date by the Reorganized Debtor as to the Pacific Class Vessels under the Shipyards Agreement shall be in the amount of $18,692,471 (a reduction of 5% from the original principal balance of $19,676,286 set forth in the Shipyards Agreement prior to the amendment and restatement provided for herein) and the first payment and subsequent monthly installment payments under each such amended and restated promissory note shall be in the amount of $202,270.83 (rather than the $212,917.00 and $212,916.66 amounts set forth in the Shipyards Agreement prior to the amendment and restatement provided for herein). (The aforesaid reduction from $19,676,286 to $18,692,471 (i.e., $983,815

per vessel and $3,935,260 in the aggregate for the four Pacific Class Vessels) is hereinafter referred to as the "Reduction"). The Reduction shall be subject to the following conditions (the "Reduction Conditions"): (a) in the event the June 20 Decision is totally reversed, or an agreement is reached with MarAd, such that the Reorganized Debtor receives all of the subsidy payments it would have received under the ODS Contract and the MSP Contracts but for the June 20 Decision, the Shipyards shall be entitled to a return of the Reduction, with such return to be accomplished through an increase in the original principal balance of each of the amended and restated promissory notes by the aggregate amount of $983,815, and the immediate payment of the product of $10,645.83 multiplied by the number of monthly installments made under each amended and restated promissory note prior to such reversal of, or agreement in connection with, the June 20 Decision, and (b) in the event the June 20 Decision is partially reversed or a settlement is reached with MarAd in connection with any appeal or judicial or administrative review of the June 20 Decision, such that the Reorganized Debtor receives less than the totality of the subsidy payments it would have received under the ODS Contract and the MSP Contracts but for the June 20 Decision, the Reorganized Debtor and the Shipyards shall attempt in good faith to agree on a proportionate return of the Reduction. In the event the Reorganized Debtor and the Shipyards cannot agree on the amount of, or method for, a proportionate return of the Reduction, then either party may file a motion with this Court seeking a resolution of this matter, and this Court hereby retains jurisdiction to decide any such motion. The Shipyards Agreement shall be deemed modified to incorporate the foregoing. The rights of the parties to the Shipyards Agreement, as to all matters described therein (including, without limitation, the form of the Pacific Class Bareboat Charter Agreements and the other documents to be executed at the closing of the Shipyards Agreement), shall not be changed, modified, prejudiced or adversely affected by any other provision of the Modified Plan, this Confirmation Order (except as stated above), or the Reorganized Debtor Term Sheet, or any documents executed pursuant to any of the foregoing. In the event of a conflict between any of the provisions of the Modified Plan, the Reorganized Debtor Term Sheet or this Confirmation Order, or any documents executed pursuant to any of the foregoing, and the provisions of the Shipyards Agreement, then the provisions of the Shipyards Agreement (including the provisions of the Shipyards Agreement regarding the form of the charter agreements for the Pacific Class Vessels and the other documents to be executed at the closing of the Shipyards Agreement) shall prevail, except as stated above in this Confirmation Order. The filing with the Court, or the attachment to any other pleading, of a Pacific Class Bareboat Charter Agreement or any other document shall not be deemed to imply that the Shipyards have consented to such document. Nothing in this Confirmation Order or the Modified Plan, including without limitation Article 11.3.2 thereof, shall (i) release any of the Blue Water Entities as to any and all claims of the Shipyards, or (ii) affect or prejudice the claims or rights of the Shipyards, on the one hand, and any of the Blue Water Entities, on the other hand, as non-debtor third parties and as between themselves. The immediately foregoing sentence shall be deemed to modify Article 11.3.2 of the Modified Plan. The word "Shipyards" in Paragraph 34 of the Amended and Restated Third Modification is hereby stricken and shall be of no further force and effect. It is further

ORDERED, ADJUDGED AND DECREED that, subject to the "Reduction Conditions" (as defined below), the Morgan Bank Group Cash Distribution shall be in the amount of $12,825.000 (a reduction of 5% from the amount of $13,500,000 set forth in the Original Plan). (The

541

aforesaid reduction from $13,500,000 to $12,825,000 (i.e., $675,000) is hereinafter referred to as the "Reduction"). The Reduction shall be subject to the following conditions (the "Reduction Conditions"): (a) in the event the June 20 Decision is totally reversed, or an agreement is reached with MarAd, such that the Reorganized Debtor receives all of the subsidy payments it would have received under the ODS Contract and the MSP Contracts but for the June 20 Decision, the Morgan Bank Group shall be entitled to an immediate payment in cash of the Reduction, and (b) in the event the June 20 Decision is partially reversed or a settlement is reached with MarAd in connection with any appeal or judicial or administrative review of the June 20 Decision, such that the Reorganized Debtor receives less than the totality of the subsidy payments it would have received under the ODS Contract and the MSP Contracts but for the June 20 Decision, the Reorganized Debtor and the Morgan Bank Group shall attempt in good faith to agree on a proportionate return of the Reduction and may agree upon a presumptive proration of such Reduction. In the event the Reorganized Debtor and the Morgan Bank Group cannot agree on the amount of a proportionate return of the Reduction, then either party may file a motion with this Court seeking a resolution of this matter, and this Court hereby retains jurisdiction to decide any such motion. It is further

ORDERED, ADJUDGED, AND DECREED that the aggregate amount of 1997 Deferred Amounts owed by the Debtor to Genstar (which includes, without limitation, certain amounts owed by the Debtor to Genstar in respect of invoices rendered in 1996) is $5,776,497.79 less the aggregate amount of payments made by the Debtor to Genstar from the date hereof to the Closing Date plus an unreconciled difference in an amount not to exceed $100,000 to be reconciled by the parties on or before July 21, 1997 (the "Unreconciled Difference"), assuming the Closing Date occurs on or before August

15, 1997 (the "Full Genstar Amount"); provided, however, that Genstar shall accept payment in the amount of $5,351,-479.79 less the aggregate amount of payments made by the Debtor to Genstar from the date hereof to the Closing Date plus the Unreconciled Difference (the "Reduced Genstar Amount") in full satisfaction of the 1997 Deferred Amounts owed to Genstar if and only if each of the following conditions is either satisfied or waived by Genstar in its sole and absolute discretion: (i) the Closing Date occurs by August 15, 1997; (ii) the Reduced Genstar Amount is paid in full, in cash, no later than 48 hours following the Closing Date; and (iii) each of the Shipyards, the Morgan Bank Group, and the other parties entitled to 1997 Deferred Amounts as to which the Debtor has requested a deduction pursuant to paragraph (d) of page 7 of the Plan Modification Motion consents to the revised treatment described on page 7 of the Plan Modification Motion; provided further, however, (x) any and all amounts due from the Debtor to Genstar with respect to postpetition invoices rendered after December 31, 1996 other than the 1997 Deferred Amounts shall be assumed and paid by the Purchaser in accordance with Article 6 of the Modified Plan, (y) in the event the June 20 Decision is totally reversed, or an agreement is reached with MarAd, such that the Reorganized Debtor receives all of the subsidy payments it would have received under the ODS Contract and the MSP Contracts but for the June 20 Decision, Genstar shall be entitled to immediate payment in cash of the difference between the Full Genstar Amount and the Reduced Genstar Amount, and (z) in the event the June 20 Decision is partially reversed or a settlement is reached with MarAd in connection with any appeal or judicial or administrative review of the June 20 Decision, such that the Reorganized Debtor receives less than the totality of the subsidy payments it would have received under the ODS Contract and the MSP Contracts but for

the June 20 Decision, Genstar and the Reorganized Debtor shall attempt in good faith to agree on a proportionate return of the difference between the Full Genstar Amount and the Reduced Genstar Amount. If the Reorganized Debtor and Genstar cannot agree on the amount of such proportionate return, then either party may file a motion with the Court seeking a resolution of this matter, and this Court hereby retains jurisdiction to decide any such motion. It is further

ORDERED, ADJUDGED, AND DE-CREED that the aggregate amount of 1997 Deferred Amounts owed by the Debtor to Transamerica is $2,615,972.29 (an amount that will be increased by $845,-756.23 on July 31, 1997 if Closing has not occurred) *less* the aggregate amount of payments made by the Debtor to Transamerica from the date hereof to the Closing Date, assuming the Closing Date occurs on or before July 31, 1997 (the "Full Transamerica Amount"); provided, however, that Transamerica shall accept payment in the amount of $2,269,972.29 if Closing occurs on or before July 31, 1997 or $3,115,728.43 if Closing occurs between July 31, 1997 and August 15, 1997 *less* the aggregate amount of payments made by the Debtor to Transamerica from the date hereof to the Closing Date (the "Reduced Transamerica Amount") in full satisfaction of the 1997 Deferred Amounts owed to Transamerica if and only if each of the following conditions is either satisfied or waived by Transamerica in its sole and absolute discretion: (i) the Closing Date occurs by August 15, 1997; (ii) the Reduced Transamerica Amount is paid in full, in cash, no later than 48 hours following the Closing Date; and (iii) each of the Shipyards, the Morgan Bank Group, and the other parties entitled to 1997 Deferred Amounts as to which the Debtor has requested a deduction pursuant to paragraph (d) of page 7 of the Plan Modification Motion consents to the revised treatment described on page 7 of the Plan Modification Motion; provided further, however, (x) any and all amounts due from the Debtor to Transamerica with respect to postpetition invoices rendered after December 31, 1996 other than the 1997 Deferred Amounts shall be assumed and paid by the Purchaser in accordance with Article 6 of the Modified Plan, (y) in the event the June 20 Decision is totally reversed, or an agreement is reached with MarAd, such that the Reorganized Debtor receives all of the subsidy payments it would have received under the ODS Contract and the MSP Contracts but for the June 20 Decision, Transamerica shall be entitled to immediate payment in cash of the difference between the Full Transamerica Amount and the Reduced Transamerica Amount, and (z) in the event the June 20 Decision is partially reversed or a settlement is reached with MarAd in connection with any appeal or judicial or administrative review of the June 20 Decision, such that the Reorganized Debtor receives less than the totality of the subsidy payments it would have received under the ODS Contract and the MSP Contracts but for the June 20 Decision, Transamerica and the Reorganized Debtor shall attempt in good faith to agree on a proportionate return of the difference between the Full Transamerica Amount and the Reduced Transamerica Amount. If the Reorganized Debtor and Transamerica cannot agree on the amount of such proportionate return, then either party may file a motion with the Court seeking a resolution of this matter, and this Court hereby retains jurisdiction to decide any such motion. It is further

ORDERED, ADJUDGED, AND DE-CREED that all settlements, agreements and compromises provided for under the Modified Plan, and all transactions, documents, instruments, and agreements referred to therein, contemplated thereunder or executed and delivered therewith, and any amendments or modifications thereto in substantial conformity therewith, are hereby approved, and the Debtor and the other parties thereto are authorized and directed to enter into them and to perform

thereunder according to their respective terms. It is further

ORDERED, ADJUDGED AND DE-CREED that all of the objections to the Plan Modification Motion specifically discussed in the findings of fact above be, and the same hereby are, overruled in all respects for the reasons set forth therein. It is further

ORDERED, ADJUDGED AND DE-CREED that notwithstanding any provision of the Modified Plan or this Confirmation Order, upon the Effective Date, the Ship Management Company shall assume liability for obligations incurred by the MEBA Benefit Plans after the Petition Date but not billed by the MEBA Benefit Plans until on or after the Effective Date, including but not limited to obligations for converted overtime (for purposes of this Confirmation Order, obligations for converted overtime shall be deemed incurred when initially paid by the MEBA Benefit Plans). All obligations billed by the MEBA Benefit Plans prior to the Effective Date are either Administrative Claims payable in full by the Debtor or Assumed Obligations payable by the Purchaser pursuant to the terms and conditions of the Asset Purchase Agreement and the Assumption Agreement. It is further

ORDERED, ADJUDGED AND DE-CREED that, Confirmation of the Modified Plan does not affect any right of the United States to set off no more than $225,056.50 on account of its Claim alleged in its objection to the Original Plan, without prejudice to the right of the Purchaser, the Debtor, the Reorganized Debtor, or any other party to contest the amount of the Claim should the United States exercise such right of set-off. It is further

ORDERED, ADJUDGED, AND DE-CREED that the APL Letter Agreement in the form attached to the Amended and Restated Third Modification be, and the same hereby is, approved in all respects. It is further

ORDERED, ADJUDGED AND DE-CREED that, notwithstanding any provision of the Modified Plan or this Confirmation Order, (i) APL's rights against any and all parties (including the Debtor, the Purchaser, Newco, and CPS) with respect to the APL Settlement Agreement, the APL Letter Agreement, the Pacesetter Charters and related documents are unaltered and shall be enforceable against any and all such parties in accordance with applicable law and subject to the foregoing agreements, and APL shall be entitled to enforcement thereof and may seek judgment with respect thereto without regard to any other provision of the Modified Plan or this Confirmation Order subject, however, to the terms of the foregoing agreements; *provided,* the Bankruptcy Court shall have jurisdiction over any such action and to enter any such judgment against the Debtor, APL shall first file such action in the Bankruptcy Court but may file it in any other court if the Bankruptcy Court rules it does not have jurisdiction, the Debtor shall continue to exist and be subject to any such action and judgment for so long as any such rights of APL shall exist, and APL may obtain personal jurisdiction over the Debtor by service of process of any such action upon Stichter, Riedel, Blain & Prosser, P.A.; *provided further,* APL shall not be entitled to enforce any judgment against the Debtor in any such action without further order of the Bankruptcy Court; *provided further,* that APL's rights and remedies against the Purchaser, Newco and CPS in connection with any such judgment against the Debtor shall be as set forth in the APL Letter Agreement and the related agreements referenced therein and shall be enforceable against the Purchaser, Newco and CPS on the terms and conditions of such APL Letter Agreement and related agreements, without the need for any further order of the Bankruptcy Court and without regard to any other provision of the Modified Plan or this Confirmation Order; (ii) none of the Debtor's rights or obligations under the APL Settlement Agree-

ment, the Pacesetter Charters, the APL Letter Agreement (or any prior version thereof) or any related documents shall revest in the Reorganized Debtor pursuant to any provision of the Modified Plan or any other document; and (iii) APL may make agreements with any other party concerning the APL Settlement Agreement, the Pacesetter Charters, the APL Letter Agreement (or any prior version thereof) and any related documents or matters on the condition that such agreements do not alter the rights of anyone not a party thereto. Any actions taken by the Debtor and APL relating to the APL Escrow Account or the APL Settlement Account in reliance upon the Escrow Funds Order or otherwise be, and hereby are, ratified and approved in all respects, provided such actions do not prejudice the rights of the Purchaser and/or CP Ships Holdings Inc. under the APL Letter Agreement, the Modified Plan or this Confirmation Order. It is further

ORDERED, ADJUDGED, AND DE-CREED that (i) the Objection of First American Bulk Carrier Corporation to Debtor's Motion on Matters Related to the Maritime Administration and to Debtor's Motion to Modify Confirmed Plan of Reorganization Pursuant to 11 U.S.C. § 1127(b) and to Modify Payment Terms of Shipyards Agreement [Docket Entry No. 3061] and (ii) First American Bulk Carrier Corporation's Response to Debtor's Conditional Motion to Reject FABC Charters and Amended Objection to Debtor's Motion to Modify Confirmed Plan of Reorganization Pursuant to 11 U.S.C. § 1127(B) and to Modify Payment Terms of Shipyards Agreement dated July 11, 1997 [Docket Entry No. 3069] be, and the same hereby are, overruled with prejudice. The FABC Charters Order governs the terms and conditions of, among other things, the assumption by the Debtor and assignment to the Purchaser of the Oceanus Class Time Charter Agreements and the FABC Cure Claim. It is further

ORDERED, ADJUDGED, AND DE-CREED that the fourth sentence of the last paragraph of Article 4.8 of the Modified Plan shall be deleted in its entirety and replaced with the following two sentences: "In the event the Oceanus Class Time Charter Agreements are rejected pursuant to the FABC Charters Order, the Plan shall not affect the rights of Barnett Bank or FABC under the Barnett Bank/FABC LCs and as to the Barnett Bank Performance Escrows. Any deficiency owing to Barnett Bank with respect to the Barnett Bank/FABC LCs shall be treated as a Class 16 Unsecured Claim." It is further

ORDERED, ADJUDGED, AND DE-CREED that the Debtor be, and hereby is, authorized to execute and deliver a novation agreement and settlement agreement with MSC. It is further

ORDERED, ADJUDGED, AND DE-CREED that, notwithstanding anything else contained in this Confirmation Order, the Purchaser is and shall be deemed to constitute a qualified transferee under the novation agreement to be executed among the Debtor, the Purchaser and MSC. It is further

ORDERED, ADJUDGED, AND DE-CREED that, except to the extent otherwise provided by the Modified Plan, upon the Effective Date, the Unsecured Creditors' Committee shall be dissolved. Upon such dissolution, the members of the Unsecured Creditors' Committee and the Professionals retained by the Unsecured Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, liabilities and obligations related to, or arising from, this case. It is further

ORDERED, ADJUDGED AND DE-CREED that the Board of Directors of the Debtor with the consent of the Reorganized Debtor Stockholder, which consent shall not be unreasonably withheld, shall take such action as may be necessary to cause the charter of the Reorganized Debtor to be amended and restated to

contain the provisions required (a) under the Bankruptcy Code with respect to any Equity Interest and the Reorganized Debtor Common Stock, (b) by the Modified Plan or this Confirmation Order, and (c) by the Asset Purchase Agreement with respect to the change of the Debtor's corporate name. Such charter, as amended and restated, be, and the same hereby is, approved. It is further

ORDERED, ADJUDGED AND DE-CREED that the Modified Plan is confirmed in its entirety as if set forth *in haec verba.* The inclusion of decretal paragraphs in this Confirmation Order referring to specific provisions of the Modified Plan or authorizing specific action by the Debtor shall not be construed to imply non-approval of other provisions or non-authorization of other actions. It is further

ORDERED, ADJUDGED, AND DE-CREED that the failure to reference or discuss any particular provision of the Modified Plan in this Confirmation Order shall have no effect on the validity, binding effect and enforceability of such provision and such provision shall have the same validity, binding effect and enforceability as every other provision of the Modified Plan. It is further

ORDERED, ADJUDGED, AND DE-CREED that, except with respect to any modifications to the Modified Plan set forth herein, to the extent of any inconsistency between the terms of the Modified Plan and this Confirmation Order, the terms of the Modified Plan shall govern. It is further

ORDERED, ADJUDGED AND DE-CREED that, on the Effective Date of the Modified Plan, the Debtor shall pay all quarterly fees due and owing to the United States Trustee through the date of entry of this Confirmation Order. The Court hereby approves the agreement reached between the Debtor and the United States Trustee on the prepayment of fees for the period following the Effective Date. It is further

ORDERED, ADJUDGED AND DE-CREED that, notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, until this case is closed, this Court shall retain the fullest and most extensive jurisdiction of this case that is permitted under applicable law, including that necessary to ensure that the purposes and intent of the Modified Plan are carried out. Without limiting the generality of the foregoing, after Confirmation of the Modified Plan and until this case is closed, this Court shall retain jurisdiction of this case for each of the specific purposes set forth in Articles 12.2 and 12.3 of the Modified Plan. Without limiting the foregoing, after Confirmation of the Modified Plan and until this case is closed, this Court shall also retain jurisdiction of this case for each of the following specific purposes (except that the jurisdiction shall be non-exclusive jurisdiction solely with respect to the Shipyards Agreement and the rights and remedies of the parties thereto and the documents referred to therein): (a) to enforce, interpret and administer, and to enter such orders as may be necessary or appropriate to implement and consummate, the terms and provisions of the Asset Purchase Agreement, the Tort Claims Trust Agreement, the Plan Documents, the Tort Claims Resolution Procedures, the Shipyards Agreement, the Reorganized Debtor Term Sheet, the APL Letter Agreement, the PBGC/SEPP Agreement, and each of the other settlements, agreements and compromises executed in connection with the Modified Plan; (b) to construe, enforce and resolve all questions and disputes relating to any interest arbitration agreements entered into by the Debtor and approved by this Court; and (c) to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of any of the Plan Documents, including without limitation the Asset Purchase Agreement, the

Tort Claims Trust Agreement, the Tort Claims Resolution Procedures, the Shipyards Agreement, the Reorganized Debtor Term Sheet, the APL Letter Agreement, and the PBGC/SEPP Agreement.